UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

Case No.: 21-cv-60976-HUNT

JOHN F. BATES, an individual,

    Plaintiff,

v.

JANET YELLEN, as Secretary,
U.S. Department of the Treasury,
Internal Revenue Service,

    Defendant.

_____/

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Janet Yellen, as Secretary of the Treasury (the "Secretary"), by and through the undersigned Assistant United States Attorney, and pursuant to Local Rule 56.1 for the Southern District of Florida, hereby submits the following material facts to which there are no genuine issues to be tried:

    1.    On May 7, 2001, Plaintiff, John F. Bates, began his employment with the Internal Revenue Service as a Special Agent. Deposition of Plaintiff on November 14, 2023 ("Deposition 1") at 64:9-12, attached hereto as Exhibit "A."

    2.    As a special agent classified in the GS-1811 series, Plaintiff met the definition of a "criminal investigator" in 5 C.F.R. § 550.103 and fulfilled the requirements and conditions of 5 U.S.C. § 5545a and 5 C.F.R. § 550.181 through 550.186 to receive law enforcement availability pay ("LEAP"). *See e.g.*, Deposition of Plaintiff on November 16, 2023 ("Deposition 2") at 137:2-19, attached hereto as Exhibit "B."

3. In receiving LEAP, Plaintiff received an additional 25% of his rate of pay for working unscheduled duty in excess of a forty-hour workweek. 5 C.F.R. §§ 550.181(a), 550.185(a).

4. In addition, Plaintiff was required to perform unscheduled duty hours or be available for work that is not part of his basic workweek. 5 C.F.R. §§ 550.181- 550.187.

5. As a Special Agent, Plaintiff investigated violations under Titles 18 and 26 of the United States Code. Depo.1 at 64:23-65:1.

6. Karen Wingerd was Plaintiff's Special Supervisory Agent ("SSA") from approximately March 2015 to July 2018. *Id*. at 69:23-70:2.

7. On February 15, 2017, Plaintiff had a caseload review with SSA Wingerd. Declaration of John Bates ("Declaration") at ¶ 23, attached hereto as Exhibit "C."

8. During the review, SSA Wingerd and Plaintiff discussed Plaintiff's sole active investigation—the "CE" investigation. Decl. ¶ 23.

9. At the caseload review, SSA Wingerd told Plaintiff "that the CE investigation was the sole priority in [his] investigative inventory." Decl. ¶ 23.

10. Despite difficulties in obtaining evidence and support from the United States Attorney's Office for the CE investigation,

> [Plaintiff] proposed at the February 2017 case review to [SSA] Wingerd a target due date for a draft of the [Special Agent Report ("SAR")] for the CE case for March 31, 2017. [SSA] Wingerd and [Plaintiff] discussed during [his] case review that current evidence needed to be analyzed. Also, [Plaintiff and SSA Wingerd] discussed that additional evidence needed to be collected and witness interviews needed to be conducted. Nonetheless, [SSA] Wingerd and [Plaintiff] agreed that it should be possible for [Plaintiff] to complete the SAR by March 31, 2017.

Decl. ¶ 26.

11. Plaintiff was on all day leave March 13, 15, 16, 17, 24, 27, 28, and April 4, 2017 and on partial day leave March 20, 21, and 23, 2017. Decl. ¶ 30.

12. Between March 20 and March 22, 2017, Plaintiff prepared to conduct a computer training seminar on March 23, 2017. Decl. ¶ 34.

13. Plaintiff acknowledged that "[he] should have discussed with [SSA] Wingerd that the target due date of March 31, 2017, for submitting an SAR for the CE investigation should be extended to April 30, 2017 or later." Decl. ¶ 32; Oral Reply dated July 13, 2017 ("Oral Reply") at 8:1-14, attached hereto as Exhibit "D."

14. At the time that Plaintiff was preparing for the computer training seminar, he did not know exactly what evidence he needed to complete the SAR. Oral Reply at 14:14-16.

15. On March 29, 2017, Plaintiff volunteered to assist in executing a search warrant in Puerto Rico. Decl. ¶ 51.

16. During the week of April 3, 2017, Plaintiff compiled evidence, prepared an estimated tax loss, and determined that he needed to gather additional evidence and conduct more witness interviews in the CE investigation. Decl. ¶ 37; Oral Reply at 15:2-9.

17. That same week, Plaintiff had a discussion with SSA Wingerd in which she told him "that she wanted a draft of the SAR for the CE investigation before [he] left for Puerto Rico." Decl. ¶ 37.

18. "On April 5, 2017, [Plaintiff] informed [SSA] Wingerd that [he] had hoped to submit a draft of the SAR for the CE investigation by either close of business Friday, April 7, 2017, or Sunday, April 9, 2017, prior to [his] departure to Puerto Rico on Monday, April 10, 2017." Decl. ¶ 41.

19. "On Friday, April 7, 2017, at 11:06 am, [SSA] Wingerd sent [Plaintiff] an email regarding the status of the SAR for the CE investigation. She noted that [Plaintiff] was expected to turn in the draft by March 31, 2017. [He] replied to her email at 12:45 pm that same day, stating that 'I hope to have a final draft in the processing folder by COB today or before I depart

for [Puerto Rico] on Monday am.'" Decl. ¶ 42; E-mail exchange between SSA Wingerd and Plaintiff on April 7, 2017, attached hereto as Exhibit "E."

20. Plaintiff "expected that [he] would be able to complete the SAR over the weekend before [he] departed for Puerto Rico on Monday, April 10, 2017." Decl. ¶ 42.

21. Plaintiff was making final arrangements for travel to Puerto Rico all day on Friday, April 7, 2017. Decl. ¶ 43.

22. At the time that Plaintiff left work on Friday, April 7, 2017, at 5:35 PM., "the draft of the SAR was not yet completed and [he had] not yet place[d] it in the processing folder." Decl. ¶ 43-44.

23. Plaintiff still had to obtain contact information for additional witnesses, conduct interviews, obtain additional tax returns with supporting schedules, and revise the appendices and exhibits of the SAR. Decl. ¶ 44.

24. Plaintiff also believed that he would possibly require additional evidence from revenue agent, Bill Ypsilantis. Decl. ¶ 44.

25. "It was [his] intention to return to the office over the weekend to begin working on the body of the SAR and entering the current evidence into the evidence manager." Decl. ¶ 44.

26. When Plaintiff arrived at home on Friday, April 7, 2017, at approximately 5:50 PM,

> [his] wife informed [him] that [they] would be celebrating Easter from that moment through Sunday evening. [His] wife stated that she did not want either of [them] to be working over [their] Easter Weekend. She stated that because [he] would be going to Puerto Rico, and she may be out of town in New Jersey from April 13, through April 17, 2017, that [they] would celebrate Easter one week early.

Decl. ¶ 45.

4

27. On Friday, April 7, 2017, at 6:23 PM, SSA Wingerd sent Plaintiff an e-mail stating, "I did not find a copy of your CE SAR in the processing folder. Please send me a copy in an email." Decl. ¶ 48; Ex. E.

28. Plaintiff "acknowledge[d] that [he] did not inform [SSA] Wingerd that he would not be completing a draft of the SAR prior to departing for Puerto Rico after stating to her that [he] hoped to have it completed by Sunday, April 9, 2017." Decl. ¶ 47.

29. Plaintiff also acknowledged that he should have communicated better with SSA Wingerd. Decl. ¶ 47.

30. Plaintiff further acknowledged that if had submitted the draft of the SAR before departing for Puerto Rico, it would have been incomplete due to the amount of investigative work that still needed to be completed and he did not want to submit an incomplete product to SSA Wingerd. Decl. ¶ 49; Oral Reply Tr. at 15:22-16:3.

31. Plaintiff did not see and/or read SSA Wingerd's e-mail from Friday, April 7, 2017 at 6:23 PM until Monday, April 10, 2017, because he did not check his work-issued Blackberry for any messages until he departed for the airport to fly out to Puerto Rico at 2:30 AM. Decl. ¶ 48.

32. Plaintiff did not respond to SSA Wingerd's e-mail. Decl. ¶ 48.

33. On Tuesday, April 11, 2017, at 4:59 PM, SSA Wingerd sent Plaintiff an e-mail requesting that he call her. Decl. ¶ 54; E-mail from SSA Wingerd to Plaintiff dated April 11, 2017, attached hereto as Exhibit "F."

34. Plaintiff did not recall seeing the e-mail while in Puerto Rico; however, he looked at the e-mail properties, which indicated that the e-mail had been opened at 5:00 PM on Tuesday, April 11, 2017. Decl. ¶ 54.

35. SSA Wingerd followed up her e-mail with a call to Plaintiff around 6:00 PM and left a voicemail. Decl. ¶ 55.

36. Plaintiff's Blackberry showed two incoming phone calls on Tuesday, April 11, 2017, at 5:00 PM from a 901-area code and at 6:01 PM from a 720-area code—neither phone number was assigned to SSA Wingerd; however, Plaintiff dismissed the calls and did not check whether the caller had left a voicemail. Decl. ¶ 55.

37. Plaintiff did not have his voicemail set up on his Blackberry and did not learn about SSA Wingerd's voicemail until he returned to the office on Thursday, April 13, 2017. Decl. ¶ 56, 59.

38. Therein, SSA Wingerd explained that Plaintiff was due to receive a WGI in July 2017 and his rating period would end on May 31; however, he was still "missing due dates despite a reduction of case load" and would not likely be in the "fully successful range" to receive the WGI. *Id*.

39. On Wednesday, April 12, 2017, as he waited for his flight at the airport, Plaintiff called SSA Wingerd at her office line at 11:38 AM and her cell phone at 12:15 PM, but did not leave a voicemail on either call. Decl. ¶ 57.

40. Plaintiff returned to the office on Thursday, April 13, 2017. Decl. ¶ 60.

41. On Thursday, April 13, 2017, at approximately 9:30 AM, SSA Wingerd went to Plaintiff's cubicle and asked him to e-mail her a current copy of the SAR for the CE investigation, which he did. Decl. ¶ 60.

42. On Thursday, April 13, 2017, at 10:35 AM, SSA Wingerd e-mailed Ms. Langford, requesting assistance with disciplinary action for Plaintiff's failure to follow management's directive and his scheduled WGI. E-mail from SSA Wingerd to Ms. Langford dated April 13, 2017, attached hereto as Exhibit "G."

6

43. On Thursday, April, 13, 2017, ay 2:22 PM, SSA Wingerd e-mailed Plaintiff to come to her office. Decl. ¶ 61; E-mail from SSA Wingerd to Plaintiff dated April 13, 2017, attached hereto as Exhibit "H."

44. Plaintiff met with SSA Wingerd at her office on Thursday, April 13, 2017 wherein SSA Wingerd asked Plaintiff three times to explain why he did not respond to her e-mail from Friday, April 7, 2017. Decl. ¶ 61.

45. At that meeting on Thursday, April 13, 2017, for the first time, Plaintiff informed SSA Wingerd that he had been observing Easter the weekend prior. Depo. 1 at 124:6-10.

46. Plaintiff explained that when he arrived at his house on Friday, April 7, 2017, he and his wife "were celebrating Easter one weekend early" and his wife had "potential plans to be traveling on Easter weekend from April 13, through April 17, 2017." Decl. ¶ 61; Depo. 1 at 107:22-109:5.

47. Following the meeting on Friday, April 13, 2017, at 4:06 PM, SSA Wingerd e-mailed Plaintiff a "summary" of their conversation. Compl. Ex. D; 2d Am. Compl. (D.E. 38) ¶ 30.

48. Therein, the e-mail stated that SSA Wingerd and Plaintiff would be meeting weekly "again" because of "[his] missing of due dates and overall performance in managing and planning [his] investigations," Plaintiff was on desk duty until further notice to focus on completing the SAR, and he was not to assist other agents unless approved to do so. Compl. Ex. D.

49. The e-mail further stated that Plaintiff had to respond to SSA Wingerd's messages "in a timely manner, even if it is on the weekends or during evening hours." Compl. Ex. D.

50. On April 19, 2017, Plaintiff filed an EEO complaint. 2d Am. Compl. ¶ 47; Decl. ¶ 67.

51. Plaintiff submitted the final draft of the SAR to management on May 17, 2017. Decl. ¶ 49.

### Reprimand

52. Plaintiff alleges that he was reprimanded verbally and in writing. 2d Am. Compl. ¶ 31(a); Depo. 1 at 94:2-18.

53. Pursuant to the Internal Revenue Manual ("IRM"), a "reprimand" is "a disciplinary action, formalized by a letter, used when the misconduct, delinquency, or other action warrants a response more severe than an admonishment, but less severe than an action involving a loss of pay, such as a disciplinary suspension or adverse action." IRM 6.751.1.2(12). IRM 6.751.1, titled "Discipline and Disciplinary Actions: Policies, Responsibilities, Authorities, and Guidance," is attached hereto as Exhibit "I."

54. A letter of reprimand is prepared by the servicing Labor Relations/Employee Relations Field Operations specialist and contains "[a]n opening statement that, 'This is a letter of reprimand for (list reason or reasons for the action).'"; "[a] statement that repetition of any misconduct or failure to correct, change, or improve the offending conduct would result in more severe disciplinary action up to and including removal"; the employee's appeal rights available through the appropriate grievance procedure; and "[a] statement that a copy of the written reprimand will be placed in the Official Personnel Folder." *Id*. at 6.751.1.16.3(3).

### Acting Supervisor

55. Plaintiff alleges he was denied the opportunity to serve as an Acting Supervisor on "numerous occasions." 2d Am. Compl. ¶ 31(b); Depo. 1 at 167:17-168:9.

56. Plaintiff could not confirm whether he had been an acting supervisor under SSA Wingerd prior to April 2017. *Id*. at 171:4-6.

57. Plaintiff only recalled serving as an acting supervisor in 2008 for 120 days and for short periods of time between 2009 and 2010. *Id*. at 173:23-175:24.

58. Plaintiff did not remember whether he had served as an acting supervisor from 2012 to 2016. *Id*. at 176:23-177:8.

59. Plaintiff attributed SSA Wingerd's non-selection for acting supervisor after April 2017 to his filing of an EEO complaint, not his religion. *Id*. at 170:9-13.

**Beck and Call**

60. Plaintiff alleges he was required to be at SSA Wingerd's "beck and call" twenty-four hours a day, seven days a week. 2d Am. Compl. ¶ 31(f); Depo. 1 at 216:23-217-23.

61. Plaintiff testified that he "was not at her beck and call like she called [him] every 5 minutes, and [he] had to answer [his] phone every 5 minutes." *Id*. at 217:16-19.

62. Rather, Plaintiff contends that he was at SSA Wingerd's beck and call because she repeatedly said, "you're on call 24/7." *Id*. at 217:18-21.

63. Plaintiff claims that SSA Wingerd said he was on call 24/7 in group meetings and to Plaintiff himself; however, he could not provide specific dates as to when she made such statements. *Id*. at 217:22-218:2.

64. Plaintiff did not recall how many times SSA Wingerd may have called him after his core duty hours because "it was pretty rare for her to -- call [him] after duty hours or on weekends because she herself wouldn't pick up her phone after duty hours on nights or weekends." Depo. 2 at 139:24-140:2.

65. Plaintiff also did not "remember getting very many emails from [SSA Wingerd] at night or on weekends," unless there was something that was pending. *Id*. at 142:2-5.

66. Plaintiff believed SSA Wingerd singled him out to use him as a "guinea pig for what she could do to other employees if they didn't respond to her timely," Depo. 1 at 141:16-17.

67. In SSA Wingerd's e-mail memorializing the April 13, 2017 meeting, SSA Wingerd wrote, "You need to ensure you respond to my messages **in a timely manner**, even if it is on the weekends or during evening hours." Compl. (D.E. 1), Ex. D (emphasis added).

68. In the Group 6504 meeting minutes for April 28, 2017, SSA Wingerd conveyed her expectation that her subordinates "[r]espond to [her] phone calls **as soon as possible (reasonable to [their] situation)**" to the entire group. Compl., Ex. E (emphasis added).

### Within Grade Increase

69. Plaintiff alleges he was denied a within grade step increase by falsifying job performance information. 2d Am. Compl. ¶ 31(h); Depo. 1 at 221:13-222:12.

70. A covered employee, such as Plaintiff, paid at less than the maximum rate of the grade for his position advance to the next higher step of the grade or the next higher rate within the grade (as defined in § 531.403) upon meeting the following three requirements:

> (a) The employee's performance must be at an acceptable level of competence, as defined in this subpart. To be determined at an acceptable level of competence, the employee's most recent rating of record (as defined in § 430.203 of this chapter) shall be at least Level 3 ("Fully Successful" or equivalent). . . .
>
> (b) The employee must have completed the required waiting period for advancement to the next higher step of the grade of his or her position.
>
> (c) The employee must not have received an equivalent increase during the waiting period.

5 C.F.R. § 531.404.

71. On July 13, 2014, Plaintiff received a within grade increase from a Step 6 to a Step 7. Notification of Personnel Action for Plaintiff effective July 13, 2014, attached hereto as Exhibit "J."

72. The waiting period for Plaintiff to advance from Step 7 to Step 8 was 156 weeks—or three years—of creditable service in Step 6. 5 C.F.R. § 531.405(a)(1)(ii).

73. On June 30, 2016, Plaintiff received a minimally successful rating on his performance appraisal for 2015 to 2016. Performance appraisal for 2015 to 2016 rating cycle, attached hereto as Exhibit "K."

74. On Monday, April 10, 2017, at 4:52 PM, the Human Capital Office ("HCO") sent SSA Wingerd, as Plaintiff's first-level supervisor, an automated e-mail, stating that "[a] within grade increase (WGI) is projected to be due for your employee, BATES, JOHN F on 7/9/2017. Because of a less than fully successful annual rating of record (minimally successful or unacceptable), the WGI will not process automatically." E-mail from HCO to SSA Wingerd dated April 10, 2017 and forwarded to Rosalind Langford on April 11, 2017, attached hereto as Exhibit "L."

75. On Tuesday, April 11, 2017, at 2:29 PM, SSA Wingerd forwarded the HCO's e-mail to Rosalind Langford, Labor Relations Specialist. *Id*.

76. On Thursday, April 13, 2017, at 10:35 AM, SSA Wingerd e-mailed Ms. Langford, stating that she would be completing Plaintiff's annual rating in June 2017; however, given his performance at the time, he would "not be fully successful in all CJEs." Ex. G.

77. On June 30, 2017, Plaintiff was notified that his less than fully successful performance precluded his WGI. Compl. Ex. I.

78. Plaintiff's rating period was extended for sixty days to improve his performance to an acceptable level of competence. *Id*.

79. With respect to Critical Element 3, Specification 1, of the June 30, 2017 letter, Plaintiff testified that "[t]he statements in here word for word are not fraudulent." Depo. 1 at 239:7-8.

80. For Critical Element 3, Specification 2, of the June 30, 2017 letter, Plaintiff does not dispute that he did not include information that he displayed his credentials in the memorandum of interview. *Id*. at 242:5-16.

81. Plaintiff testified that he did not include information about displaying the credentials because SSA Wingerd was "too stupid to bring her credentials to the interview" and he did not want to embarrass her by "put[ting] in there that [he] displayed [his] credentials, and she did not have her credentials." *Id*. at 242:11-16, 244:5-8.

82. For Critical Element 4, Specification 1, of the June 30, 2017 letter, Plaintiff took issue with the fact that he did not have "one active" criminal investigation to work on and use of "final draft." Depo. 2 at 7:16-25.

83. Plaintiff acknowledged that he had only one active investigation as early as February 2017. Decl. ¶ 23.

84. On April 7, 2017, Plaintiff stated to SSA Wingerd that he had hoped to have a "final draft" of the SAR in the processing folder. Decl. ¶ 42.

85. For Critical Element 4, Specification 2, of the June 30, 2017 letter, Plaintiff did not deny that he conducted an interview with SSA Wingerd on October 18, 2016; he provided her with a memorandum of interview on December 7, 2016; SSA Wingerd told him that memorandums of interview should be prepared within a week of their interview; she asked him to read Special Agent Investigative Techniques Lesson 12; and he did not read said Lesson. Depo. 2 at 37:24-40:15.

86. For Critical Element 4, Specification 3, of the June 30, 2017 letter, Plaintiff agreed that that paragraph was accurate. *Id*. at 42:25-43:3.

87. For Critical Element 4, Specification 4, of the June 30, 2017 letter, Plaintiff did not recall which tax returns he had with him at the interview; he confirmed that he required additional tax returns after the interview; and agreed that he had to conduct an additional interview. *Id*. at 64:22-66:4.

88. On September 15, 2017, following the completion of the sixty-day extension of Plaintiff's rating period, Plaintiff was issued a successful rating and informed that his WGI would be released. Depo. 2 at 66:16-67:1; Letter from SSA Wingerd to Plaintiff dated September 15, 2017, attached hereto as Exhibit "M."

### Unsuccessful Performance Evaluation

89. Plaintiff alleges that on September 15, 2017, SSA Wingerd issued an unsuccessful performance evaluation. 2d Am. Compl. ¶ 31(i).

90. Plaintiff agreed that Paragraph 31(i) of the Second Amended Complaint contains a typo and SSA Wingered "issued a successful performance evaluation" on September 15, 2017, not an unsuccessful performance evaluation. Depo 2. 66:16-67:5.

91. Plaintiff maintains that the September 15, 2017 letter still forms part of his hostile work environment claim "[b]ecause the letter says, 'Over the next 12 months, if you do anything similar like this, you may be terminated'" and SSA Wingerd can "make additional false claims, or devious or deceptive type statements about [him] and then [he] might be fired." Depo 2. 67:9-11, 67:18-20.

92. The September 15, 2017 letter says, "In accordance with Office of Personnel Management Regulations, if your performance again becomes unacceptable before June 30,

2018 I may recommend your removal or reduction in grade/payband without affording you an additional opportunity to improve your performance." Ex. M.

### False Deadlines

93. Plaintiff alleges SSA Wingerd created false deadlines for the submission of Plaintiff's reports. 2d Am. Compl. ¶ 31(l).

94. Plaintiff attributed SSA Wingerd's "false" deadlines to her "lack of experience as a field agent." Answer to Interrogatory No. 10, Answers to Interrogatories, attached hereto as Exhibit "N."

### Attaché

95. Plaintiff alleges he was improperly removed from the application process for an attaché position. 2d Am. Compl. ¶ 32; Depo. 2 at 95:24-96:8.

96. When asked to explain his basis for believing that SSA Wingerd had interfered in his application process for the attaché position, Plaintiff answered that he believed SSA Wingerd "would have made false statements if she talked to someone about [him] applying for" the attaché position; however, he did not have proof and did not know whether SSA Wingerd actually spoke to someone as part of his application for the attaché position. *Id*. at 96:25-97:16.

Respectfully submitted,

**MARKENZY LAPOINTE**
**UNITED STATES ATTORNEY**

By: *Amy L. Soto*
AMY L. SOTO
ASSISTANT U.S. ATTORNEY
Florida Bar No. 124858
E-Mail: amy.soto@usdoj.gov
99 NE 4th Street, Suite 300
Miami, Florida 33132
Telephone: (305) 961-9368