Exhibit "C"

## DECLARATION OF JOHN BATES

I, John Bates, declare as follows:

A.      Professional Background

1.      I started my career as a Federal employee in January of 1996 with U.S. Immigration and
Naturalization Service (INS). I wanted to become a federal employee (specifically with INS)
because my family was heavily committed to government service. I believed that government
service was a well-founded manner to show support of our government and national pride. My
father, aunt, oldest sister, and brother-in-law all have made significant contributions to the
Federal service. Furthermore, my second oldest sister was a captain in the U.S. Army and retired
as a Full Commander in the U.S. Navy Reserves. Like these members of my family, I wanted to
make a beneficial impact to our country by serving as a Federal employee.

2.      In January 1996, I began employment with INS as an Immigration Inspector at Port
Everglades, Florida (PEV), which includes the Ft. Lauderdale International Airport, Port
Everglades Seaport (cruise ship, terminal, and cargo vessels), Executive International Airport,
and the General Aviation Facility next to FLL. I remained with INS until May 2001. During my
employment with INS, I developed a secondary inspection system to expedite the removal of
illegal aliens. The system streamlined the 4-5-hour process to 20 minutes. PEV lead the nation in
a particular category – expedited removal on arriving craft. PEV had only eighteen (18)
inspectors, yet it led the entire nation with this particular statistic. This expedited removal
program had six (6) different applications and was implemented nationwide. On at least five (5)
occasions, I was a guest instructor to teach other inspectors how to use my program at the federal
law enforcement training center in Artesia, New Mexico. For these trainings, I produced and

1

provided customized CD's to be utilized at each student's port of entry. The applications are still in use today.

3.    From July 1997 until my departure from INS in May 2001, I was detailed as a Special Assistant to the District Director's Office of the Miami Field Office. In this role, I created numerous projects for the public information office and internal communications on behalf of the District Director. On several occasions, I presented these projects to the entire field office and to then U.S. Immigration Commissioner Doris Meisner.

4.    The entries that I created for the public domain of the INS website remained long after I transferred to IRS-CI. The largest project that I worked on while employed at INS was a proposal to GSA (via approval of Congressional Sub-committee for INS) to relocate the District Office to a new site in the Miami area. I created the project, which was under the direct review of Attorney General Janet Reno, her staff, and U.S. Representatives Carrie Meek, Lincoln Diaz-Balart, and Ileana Ros-Lehtinen. The project to relocate the U.S. INS District was approved and funded just prior to the re-organization of U.S. Customs and INS in October of 2003. I received a monetary award and/or performance awards each year from 1997 to 2001. I received nearly perfect rating for my last evaluation just prior to leaving for IRS.

5.    On May 7, 2001, I transferred to the Internal Revenue Service (IRS-CI) to work as a Special Agent. I have now been in this position for over 16 years. My current first-level supervisor is Karen Wingerd, Supervisory Special Agent (SSA). My current second-level supervisor is Anthony Dominicis, Assistant Special Agent in Charge (ASAC) – Miami Field Office (MFO).

6.    As a Special Agent, my duties include conducting administrative and/or grand jury investigations that involve alleged violations of Title 26, Title 18, and Title 31 of the United

2

States Code (tax evasion, money laundering, and identity theft). I also interview witnesses and subjects, obtain documentary evidence, prepare referral packages for review by IRS-Centralized Case Review (CCR), IRS-CT Counsel, Special Agent in Charge (SAC), U.S. Department of Justice – Tax Division (DOJ-Tax), and the U.S. Attorney's Office (USAO). I conduct arrest warrants, search warrants, fugitive arrests, protection details for witnesses and other IRS employees, and assist other Federal agencies and local law enforcement. I also submit mutual legal assistance treaty requests (MLATs), which are international requests for cooperation from non-U.S. law enforcement.

7.      The Special Agent Report (SAR) is the final written product of an IRS-CI investigation involving criminal tax violations. The evidence included in a SAR will include tax returns with supporting transcripts, schedules of tax return data, affidavits, memorandums of interview and/or activity, seized evidence with analyses and third party records. The SAR is an active document, which undergoes numerous reviews and revisions. In many instances, the initial preparation phase will render one or more defects with the evidence, such as inconsistent witness statements, statute of limitations issues or other evidentiary issues pertaining to the recommended charges. The SAR is reviewed first by the SSA, second by CCR, third by CT Counsel, fourth by ASAC/SAC, fifth by DOJ-Tax, and lastly by the Assistant U.S. Attorney at the USAO. Upon completion of the review process of the SAR and supporting evidence, the Assistant U.S. Attorney decides whether to initiate judicial proceedings for one or more subjects.

8.      During the initial phase of my employment with IRS-CI, I created wallet-sized telephone books for emergency situations when cell phones were either unavailable or not functioning. At the request of the SAC's office, I regularly produced updated versions of the booklets each quarter. At one point, I was producing wallet-sized telephone booklets for each employee in five

3

(5) different field offices. In order to curb this administrative burden, I created user instructions for others to use to re-create the booklets.

9.     Later in my employment with IRS, I held numerous official and unofficial collateral duties for the MFO. I was the MFO Radio Coordinator (and back-up coordinator) from 2003 to 2009. Currently, I am a Firearms Instructor and Use of Force Coordinator for Defensive Tactics and training. I frequently volunteer to assist other agents and management with enforcement actions, such as search warrants, arrest warrants and administrative activities late in the evenings and weekends.

10.    Furthermore, I have participated in the FLRP program, which was created to develop candidates for supervisory special agent positions and upper management. I completed the SE Area FLRP seminar and the National FLRP Seminar in Washington, D.C. In 2008, I received a sixty-day assignment as an acting supervisory special agent, which was extended an additional sixty days. My evaluations were extremely positive and commended my decision-making skills.

11.    My most notable contributions to IRS-CI are related to my computer knowledge and problem solving skills. Frequently other special agents, supervisory special agents (including Ms. Wingerd), support staff and assistant special agents in charge have asked for my assistance to develop and/or fine tune their work products and/or to solve a unique problem. I am considered by many MFO employees and employees in many other field offices to be a subject matter expert of computer applications, especially Microsoft (MS) Excel. I always welcome the opportunity to assist my colleagues.

12.    During my entire career with IRS-CI, I have assisted many agents with preparing charts for trial and sentencing. Recently, I was asked by SSA Robert Lopez and ASAC Anthony Dominicis to assist with a pending deadline for sentencing. They had employed numerous

4

employees over a two-week period of time to extract names and other PII from over 40,000 rows of jumbled data. At the time they sought my assistance, they had only achieved results from approximately 500 rows of data. In approximately ten minutes, I extracted more than 22,000 unique names and other PII from the entire data set by creating a series of "if then else" statements to evaluate repetitive markers to extract names, social security numbers and dates of birth. I then eliminated duplicates with a simple evaluation of the extracted data. ASAC Dominicis asked me to explain the details of this process to him. ASAC Dominicis acknowledged to me that he was impressed my skill with MS Excel and expressed his gratitude for my assistance to Ms. Wingerd.

13.      Furthermore, I have been authorized to conduct small training sessions with agents and support staff with the use of MS Excel and various applications to share my advanced knowledge, skills and abilities with other special agents and support staff. To date, I have conducted two sessions for using MS Excel and one session for the Palantir database. Throughout my employment with the federal government, I have received performance awards and monetary awards until IRS discontinued the practice due to budgetary issue.

B.      Caseload Review Process

14.      I have regular caseload reviews with my supervisor, SSA Wingerd. During a caseload review, all general investigations (GI), primary investigations (PI), and subject criminal investigations (SCI) are reviewed for status updates and recent developments. During each caseload review (every quarter), the supervisory special agent (SSA) prioritizes all of the pending investigations and required evidence gathering to complete the investigative process. Ms. Wingerd during my case reviews typically classifies the oldest investigation as the top

5

priority. There are hundreds of different status codes utilized in the CIMIS database to document the progression of criminal investigations for IRS-CI.

15.     Upon referral of an investigation from IRS-CI to DOJ-Tax and/or the USAO, the investigation is deemed to be "in the pipeline." The use and/or recording of estimated due dates for the investigation are discontinued for the remaining judicial process. The reason why the use of deadlines is discontinued is because the due dates and/or the work necessary to meet those due dates are controlled by DOJ-Tax and the USAO.

16.     QRP stands for Questionable Refund Fraud Program. QRP fraud refers to a group of federal tax returns having a particular repetitive type of fraudulent items – such as false Schedule C income or the exact same wages and withholding for the same employer(s) or false fuel tax credit or some other repeating item.

17.     RPP stands for Return Preparer Fraud Program. Generally, an RPP investigation involves a "fly by night" return preparer business that disappears at the end of a tax filing season and/or the possible law enforcement activity. In many cases, the return preparer is registered with IRS. The return preparer fraud is identified at the Scheme Development Center from an analysis of unusually large numbers of false returns having the same or nearly identical fraud.

18.     SIRF stands for Stolen Identity Refund Fraud Program. A SIRF case presents numerous problems in itself – due to the need for speed to get the evidence and track the disbursement of false refunds. The return preparer is usually untraceable. The money is usually transmitted to pre-paid debit cards, which is withdrawn rapidly from ATM's or wired into other accounts having pre-paid debit cards.

19.     The last three investigations that I have completed were "hybrid" investigations that comprised two or more types of fraud. The "CE" investigation at issue in the Proposal was a

hybrid investigation. I recently referred back-to-back hybrid investigations to DOJ-Tax on September 29, 2016, and December 5, 2016. The investigations are currently pending in the pipeline. They contain all of the three elements described above (QRP, RPP, and SIRF). Hybrid investigations are exhausting due to the slow pace of gathering testimony and documentation. I have developed streamlined methods to improve the speed of this process and shared these techniques throughout the MFO as well as with headquarters.

20.     QRP, RPP, and SIRF investigations are laden with numerous witness interviews and most importantly "attempted" witness interviews. Based on my experiences, for approximately every ten witnesses contacted, only one witness interview is actually completed. This extremely low ratio is due to the nature of the clients and/or victims of identity theft. Many victims of identity theft are elderly, prison inmates, out of state residents, and/or minors. Likewise, many clients of RPP live in low income areas. Two (2) agents typically attempt each interview in a low income area. The need for coordinating these interviews often can slow down the investigative process and creates additional work.

21.     In CIMIS, all investigations must follow a progression to completion. A general investigation (GI) and/or a primary investigation (PI) must precede a subject investigation (SCI). Gathering evidence for a GI and/or PI can be difficult due to the limited number of methods available to gather evidence to support investigative development.

    C.     February 15, 2017 Caseload Review - CE Investigation

22.     Caseload reviews include all currently assigned investigations. By December 5, 2016, all of the SCI's in my inventory were in the pipeline, except for the CE investigation and a pending (overaged) primary investigation (PI). A request package to elevate the PI to an SCI was submitted on August 23, 2016. Evidence gathering for this PI was difficult due to a lack of

7

cooperation with the victim(s) and the nature of the fraud. I was unable to gather any additional evidence for the PI case. Hence, a SCI request package was submitted, which included a PI evaluation memo and supporting evidence. On August 23, 2016, CT Counsel concurred with the opening of a SIRF investigation and joined the existing grand jury investigation at the USAO. On October 16, 2016, ASAC Anthony Dominicis declined the request to elevate the PI to an SCI.

23.     On February 15, 2017, Ms. Wingerd and I met to have a caseload review. During the February 15, 2017 caseload review, Ms. Wingerd and I discussed the status of the remaining investigations that were not in the pipeline, which were the CE investigation (SCI) and the still pending PI investigation (mentioned above in paragraph 22). Ms. Wingerd stated to me during the case review that the PI investigation was going to be closed. On May 15, 2017, the PI was closed. Therefore, the only active investigation in my inventory at that time of the February 2017 case review was the CE investigation. Ms. Wingerd told me at that time that the CE investigation was the sole priority in my investigative inventory.

24.     At that time of the caseload review, the listed due date in CIMIS for the CE investigation was June 30, 2015. As such, the due date had been expired for over a year. The due dates in CIMIS are reviewed during "Op Reviews" by the Assistant Special Agent in Charge (ASAC) with each Supervisory Special Agent (SSA). I understand that the last Op Review prior to my February 15, 2017 case review took place in July 2016. The CE investigation's due date was not updated as a result of that Op Review. Prior to Op Reviews the due date is usually updated by the SSA and/or the special agent.

25.     The CE investigation is a hybrid investigation having elements of QRP fraud, RPP fraud, and SIRF. The CE investigation has been a difficult investigation to complete. The CE

investigation was classified as an on-going grand jury investigation. IRS special agents can conduct criminal investigations administratively or through the grand jury. In this particular case, the CE Investigation was opened as a SIRF grand jury investigation. The initial Assistant U.S. Attorney (AUSA) assigned to the investigation accepted an extended detail to Washington, D.C. in December 2015. The U.S. Attorney's Office (USAO) deputy chief unsuccessfully attempted to reassign my grand jury SCI's to another AUSA. In sum, I was left without an AUSA on the CE investigation. When a grand jury investigation is missing an AUSA for a special agent to work with, there is no ability to issue subpoenas or other official documents to assist the special agent in conducting the investigation and collecting evidence.

26.     Despite the difficulties of obtaining evidence and support from the USAO for the CE investigation, I proposed at the February 2017 case review to Ms. Wingerd a target due date for a draft of the SAR for the CE case for March 31, 2017. Ms. Wingerd and I discussed during my case review that current evidence needed to be analyzed. Also, we discussed that additional evidence needed to be collected and witness interviews needed to be conducted. Nonetheless, Ms. Wingerd and I agreed that it should be possible for me to complete the SAR by March 31, 2017.

27.     At that time, I explained to Ms. Wingerd that I needed for the CE case to obtain documents and testimony, including copies of tax returns in the names of victims of identity theft and clients of the subject. Each tax return requires a supporting account transcript, which I also would need to obtain. Also, I needed to review evidence obtained at that point, including witness interviews and copies of actual tax returns. I needed to evaluate an estimated tax loss and the statute of limitations for each tax return. Once the final list of witnesses and their corresponding tax returns were identified, a criminal tax loss computation was required from the cooperating

revenue agent. The processing of many these items were out of my control. None of the requests for the tax returns and supporting transcripts were forwarded by Ms. Wingerd as a priority, and as a result I did not promptly receive these items.

28.    During the caseload review, Ms. Wingerd asked me for the amount of the current estimated tax loss for the investigation. On February 15, 2017, the estimated tax losses for each of the recommended violations were not final and the figures were expected to change. As such, I provided to Ms. Wingerd a ball park figure of approximately $300,000 for the specific charges and a projected relevant conduct tax loss greater than $2 million. My estimated tax loss can be summarized by the following: a) SIRF losses of $55,000; b) RPP fraud losses of $80,000; and c) Access device fraud losses of $160,000. Ms. Wingerd deemed these tax loss figures to be acceptable based on previous conversation with CT Counsel.

29.    However, when I later reviewed the actual tax returns and supporting evidence, I was required to eliminate tax returns with expired and/or pending expiration of statute of limitations. The estimated tax loss was then further reduced to extremely low levels below LEM criteria established by the USAO. The estimated tax losses based on the compiled evidence were ultimately the following: a) SIRF losses of $39,421; b) RPP fraud losses of losses $49,451; and c) Access device fraud losses of $162,000.

D.    CE Investigation – SAR due date of March 31, 2017

30.    The March 31, 2017 due date for a draft of the SAR for the CE investigation was entirely contingent on me obtaining and evaluating all of the evidence necessary to complete the SAR. Ms. Wingerd was aware of what still needed to be completed since we went through the steps needed to be taken to meet deadlines during the February 15, 2017 caseload review. At that time, approximately fifteen (15) work days remained from the case review on February 15, 2017, until

the deadline of March 31, 2017. I unfortunately was not able to obtain and/or evaluate this evidence by March 31, 2017, for two reasons. First, I came down with the Flu or a Flu-like illness for that entire period of time. I requested and was granted annual/sick leave (all day – 8 hours) for 3/13/17, 3/15/17, 3/16/17, 3/17/17, 3/24/17, 3/27/17, 3/28/17, and 4/4/17. I also requested and was granted leave (partial day) for 3/20/17, 3/21/17, 3/23/17. All requests for leave were approved by Ms. Wingerd or an Acting Supervisory Special Agent.

31.     Secondly, Ms. Wingerd had coordinated an all-day computer training seminar for March 23, 2017. Ms. Wingerd requested Analyst Kim Theobald to conduct the computer training seminar. Prior to the caseload review on February 15, 2017, Ms. Wingerd asked me to assist Ms. Theobald with the presentation on March 23, 2017. For approximately two weeks prior to March 23, 2017, Ms. Wingerd attempted to schedule a meeting with Ms. Theobald and myself to review the training agenda.

32.     On the morning of March 20, 2017, Ms. Wingerd and I contacted Ms. Theobald via telephone in Ms. Wingerd's office. During this call, Ms. Theobald told Ms. Wingerd that she could not be present for the computer training on March 23, 2017. After the conference call ended, Ms. Wingerd asked me to conduct the entire training on March 20, 2017. Ms Wingerd also stated to me that she would not be able to attend and/or assist me with the training seminar. Ms. Wingerd asked me if I would be able to prepare for the training by March 23, 2017. I agreed to do so. At this moment, I should have discussed with Ms. Wingerd that the target due date of March 31, 2017, for submitting an SAR for the CE Investigation should be extended to April 30, 2017 or later. Regrettably, I did not.

33.     At that time, Ms. Wingerd also informed me that she would not be in the office in Plantation to assist with the training. Ms. Wingerd asked me if I was okay with conducting the

presentation without any assistance. I stated in response that I should be fine because I have led numerous trainings at FLETC and other presentations. Ms. Wingerd stated to me that she was going to be out of the office on March 23, 2017, through April 3, 2017. SSA Robert Lopez notified our group and the SAC's office that Andrew Schmit would be the acting supervisor for Group 6504 while Ms. Wingerd was away.

34.     From March 20, 2017, through March 22, 2017, I spent my entire work hours preparing to lead the computer training seminar on March 23, 2017. In preparation of the training, I reviewed all of the online training videos and IRS online information. I also coordinated the computer support staff for assistance with physical assets and server access. I was later informed by Ms. Wingerd and Ms. Theobald that they received overwhelmingly positive responses to my instruction. Immediately after completing the training session, I requested sick leave from acting SSA Andrew Schmit. On March 23, 2017, I received medical treatment at the Broward Urgent Care Center in Weston, Florida.

35.     During the acting assignment, Mr. Schmit did not have the computer permissions as a supervisor to approve leave requests in the calendar for Group 6504. Hence, I requested leave via email, which Mr. Schmit forwarded to TFIA Sally Space to notate the calendar with "other items" of my leave status.

36.     On or about March 27, 2017, I spoke with Mr. Schmit. He stated to me that one or more of more of my co-workers in Plantation advised him that I appeared to them to be very sick with a constant cough. Mr. Schmit stated to me that he had a similar issue with one of the agents in the Port St. Lucie office, Mark Nirenberg. Mr. Schmit stated that he and Special Agent Louis Babino complained to Ms. Wingerd that Special Agent Mark Nirenberg should not be in the office due to his illness and possibly being contagious. I briefly discussed with Mr. Schmit the

pending draft of the SAR for the CE investigation. Mr. Schmit stated that no one would fault me not getting the SAR completed by March 31, 2017. Mr. Schmit advised me to telework while I recovered from my illness. I stated that I was physically unable to work due to the lack of sleep from the constant coughing during nighttime. Mr. Schmit then emailed me with approval to take leave and/or telework from my residence.

E.   CE Investigation – SAR post due date of March 31, 2017

37.   During the week of April 3, 2017, after I returned from sick leave, I compiled evidence and prepared a more accurate estimated tax loss for the CE case. I then determined that I would need to gather additional evidence and to conduct more witness interviews. During the week of April 3, 2017, I recall having a discussion with Ms. Wingerd about my upcoming trip to Puerto Rico, scheduled the week of April 10, 2017, and recall that she told me that she wanted a draft of the SAR for the CE investigation before I left for Puerto Rico. When Ms. Wingerd came back to the office on April 4, 2017, I could not deliver to her a viable draft of the SAR with so many missing pieces (as explained above). The draft of the SAR at that time would not have any changes to previous copies previously provided to Ms. Wingerd.

38.   I reviewed all accumulated evidence on April 3, 2017, and re-compiled Appendix A - Statute of Limitations with all of the evidence obtained to date. Through this process, I determined that additional interviews were needed. I prepared and provided an estimated total of individuals that would be contacted. I also placed additional memos of interview and the list of the new witnesses to be contacted in the group processing folder on the server for Ms. Wingerd's review. I then emailed Ms. Wingerd to let her know that the list was there for her review.

39.   In the course of the CE investigation, I attempted to contact at least one-hundred and fourteen (114) witnesses by telephone in April 2017. I was not able to contact all of these

witnesses until April because I had been in the process of estimating the tax loss to determine the required number additional witnesses needed. These attempted interviews resulted in ten (10) newly added witnesses and approximately thirty (30) additional tax returns to be included in the report. The last of these interviews was completed on April 21, 2017.

40.     I also determined that I needed to obtain more of the following: copies of witness tax returns, witness account transcripts, individual return transcripts (IRP), and "criminal computation" of the tax losses (RAR). The RARs are computed by using the evidence from the witness interviews, tax returns, and account transcripts. The RARs are provided by an assigned cooperating revenue agent from a grand jury pool of revenue agents. Per my request for technical assistance with the CE investigation, I was assigned Revenue Agent Bill Ypsilantis. On February 24, 2017, I provided Mr. Ypsilantis with the information for the first of two (2) RAR's for a husband and wife. He did not provide to me these two RAR's until April 18, 2017. The last of the remaining missing evidence needed to complete the SAR were the RAR's were provided to me on May 16, 2017.

41.     On April 5, 2017, I informed Ms. Wingerd that I had hoped to submit a draft of the SAR for the CE investigation by either close of business Friday, April 7, 2017, or Sunday, April 9, 2017, prior to my departure to Puerto Rico on Monday, April 10, 2017. I detailed for Ms. Wingerd the reasons why I was unable to finish the SAR on March 31, 2017. In particular, Ms. Wingerd and I discussed my illness and the computer training that I conducted on March 23, 2017. At that time, she stated to me that she had heard very good things about my instruction at the Palantir training.

42.     This discussion was followed by the exchange of emails on April 6, 2017, and April 7, 2017. On Friday, April 7, 2017, at 11:06 am, Ms. Wingerd sent me an email regarding the status

of the SAR for the CE investigation. She noted that I was expected to turn in the draft by March 31, 2017. I replied to her email at 12:45pm that same day, stating that "I hope to have a final draft in the processing folder by COB today or before I depart for [Puerto Rico] on Monday am." I was never directly informed that I needed to submit a draft by April 9, 2017, but I expected that I would be able to complete the SAR over the weekend before I departed for Puerto Rico on Monday, April 10, 2017.

43.     During the entire day of Friday, April 7, 2017, I was preparing final arrangements for travel to Puerto Rico, which included numerous emails and telephone calls with the other agents traveling to Puerto Rico. Also, I was directly communicating with SAC staff regarding the travel authorization and specifically travel coordinating airfare and rental vehicle arrangements. My discussion with Ms. Wingerd on Friday April 7, 2017, regarding the SAR for the CE Investigation (described above) was very brief due to the focus of our discussion regarding the remaining unresolved travel issues to Puerto Rico.

F.     After Core Duty Hours on April 7, 2017

44.     I departed from work at approximately 5:35 pm on April 7, 2017. At that time, the draft of the SAR was not yet completed and I did not yet place it in the processing folder. I still had to obtain contact information for additional witnesses, conduct interviews, obtain additional tax returns with supporting schedules, and revise the appendices and exhibits of the SAR. Also, I considered that I would possibly need additional criminal RAR's from Mr. Ypsilantis. At that time, the processing folder contained evidence of witness interviews and supporting third party records for Ms. Wingerd's review. It was my intention to return to the office over the weekend to begin working on the body of the SAR and entering the current evidence into the evidence manager.

45.     When I arrived at home on Friday, April 7, 2017, at approximately 5:50pm, my wife informed me that we were celebrating Easter from that moment through Sunday evening. My wife stated that she did not want either of us to be working over our Easter Weekend. She stated that because I would be going to Puerto Rico, and she may be out of town in New Jersey from April 13, through April 17, 2017, that we would celebrate Easter one week early. My wife also reminded me that we expected to honor the Sabbath every Sunday, especially for Easter.

46.     We attend Church by the Glades (CBG), which has approximately 15,000 active members. Each Easter, CBG conducts two (2) weekends of Easter services and strongly urges regular members to attend only the first weekend of services. Hence, CBG has more room for first time guest attendance, which is known to be the highest on Easter Day. Because of this and the reasons stated above, my family celebrated Easter one week early, during the weekend of April 7-9, 2017.

47.     I acknowledge that I did not inform Ms. Wingerd that I would not be completing a draft of the SAR prior to departing for Puerto Rico after stating to her that I hoped to have it completed by Sunday, April 9, 2017. I now understand that I should have communicated better with Ms. Wingerd throughout the entire process of completing a draft of the SAR for the CE investigation. Due to my religious practices and the reasons noted above, I did not notify Ms. Wingerd during the weekend of April 7-9, 2017, that I was unable to submit a draft of the SAR before I left for Puerto Rico on Monday, April 10, 2017.

48.     After I departed from the office at 5:35 pm that Friday, Ms. Wingerd sent me email at 6:23 pm. Ms. Wingerd's email stated, "I did not find a copy of your CE SAR in the processing folder. Please send me a copy in an email." I did not see and/or read this email message until early Monday, April 10, 2017. My Blackberry apparently received the email message, but I did

not check my Blackberry for any type of messages until my departure from my residence to the airport at approximately 2:30 am on Monday, April 10, 2017. I did not reply to the email at 2:30 am on Monday, April 10, 2017, because I thought the email message may activate Ms. Wingerd's Blackberry and disturb her sleep or possibly her family at such an early time of the day.

49.     Had I submitted the draft of the SAR before departing to Puerto Rico, it would have been incomplete and most likely with no changes since the prior copy of the SAR had been provided to Ms. Wingerd, due to amount of investigative work that still needed to be completed (as explained above). I did not want to submit an incomplete product to Ms. Wingerd.  The final missing evidence was ultimately received on the evening of May 16, 2017, at approximately 6:00 pm. The final draft of the SAR with the necessary evidence to provide accurate tax loss figures was submitted to management at approximately 9:00 am on May 17, 2017.

50.     On Monday, April 10, 2017, Ms. Wingerd revised the official due date for the CE SAR in CIMIS from June 30, 2015, to April 30, 2017. From my experience, due dates for completing SAR reports are easily and frequently changed. When Ms. Wingerd changed this due date to April 30, 2017, the SSA would normally have a discussion with the agent to determine the proper due date. However, Ms. Wingerd was not able to get a hold of me on April 10, 2017, when I was on official business in Puerto Rico.

        G.    Official Travel to Puerto Rico

51.     The initial email requesting assistance in Puerto Rico was emailed on March 28, 2017. That email was forwarded by acting SSA Andrew Schmit to Group 6504 on March 28, 2017. (As described above, Ms. Wingerd made Mr. Schmit acting SSA until she returned to the office on April 4, 2017). On the morning of March 29, 2017, I offered to assist with the search warrant in

Puerto Rico. In the afternoon of March 29, 2017, Mr. Schmit re-submitted my name to ASAC Anthony Dominicis.

52. On April 4, 2017, SSA Jose Diaz sent an email to eighteen (18) agents, including myself, with the travel codes to schedule travel to Puerto Rico to assist with a large search warrant. On April 5, 2017, I submitted an ERC ticket to reactivate my travel credit card. To process this ERC ticket, Ms. Wingerd was required to authorize the restoration of my spending limits. Also, I submitted an authorization for travel in CONCUR. Ms. Wingerd assisted throughout the process with the authorization needed and making reservations for hotel and airfare. Ms. Wingerd submitted the final approval for my authorization to travel to Puerto Rico on April 6, 2017, at 5:15 pm.

53. In my experience, a due date for the submission of a draft SAR would not supersede the need to assist with a search warrant. Hence, I did not believe that I could request to back out of the search warrant, to instead complete the SAR. Further, all of the travel arrangements to Puerto Rico, such as pre-authorization, hotel, airfare, and other items, were approved by Ms. Wingerd on April 6, 2017. She was aware of the trip.

54. On April 11, 2017, at 4:59 pm, Ms. Wingerd sent me an email. The email stated, "Call me when you get this 954-991-4438." I do not recall seeing or receiving this email while in Puerto Rico. However, after I received the Proposal, I looked in MS Outlook for this email. I found the email, and reviewed its properties. The properties indicate that the email was read at 5:00 pm on April 11, 2017. I have no recollection of reading this email in Puerto Rico, on April 11, 2017, but I concede that I may have read it then given that the email's properties indicate the email was read on April 11, 2017.

55. According to the Proposal, Ms. Wingerd on April 11, 2017, "followed up with [me] via phone around 6:00 p.m. instructing [me] to give her a call" and "left [me] a voice mail." There are no missed or incoming telephone calls listed on my Blackberry from either of Ms. Wingerd's office and/or her cell phone on April 11, 2017. My Blackberry shows two telephone calls to my cell phone on April 11, 2017. The first phone call is from (901) 214-2999 at 5:00 pm. The second phone call was from (720) 550-9594 at 6:01 pm. Neither telephone number is specifically assigned to Ms. Wingerd.   Due to the numerous "robo-calls" that other special agents and I had been receiving during this period of time, I dismissed the phone call at 6:01 pm when I noticed it on the morning of April 12, 2017, and did not check whether the caller had left me a voice message because I did not recognize either of these numbers.  The voice mail for my cell phone and the cell phones of other agents in Group 6504 is not automatically setup to alert the user of new and/or unread voicemails. I did not receive any notification on my Blackberry on April 11, or April 12, 2017, that I had a voice message. I did not learn about Ms. Wingerd's April 11, 2017 voice message, until after I returned to the office on April 13, 2017.

56. April 11, 2017, was the date of the execution of the search warrant in Puerto Rico. I was very busy with this operation and exhausted when I returned to my hotel late that afternoon. Travel to the staging location in Ponce, Puerto Rico began at 5:30am that day. We arrived at the staging location at approximately 8:00am. The search warrant began at approximately 9:00am. Several agents, including myself, were released late in the afternoon from the search warrant. I returned with several agents to my hotel in San Juan later that afternoon. By that time on April 11, 2017, I had experienced a major disruption to my sleep patterns. I did not note the time that we actually arrived, but I fell asleep soon after arriving at the hotel.

57.   On April 12, 2017, I attempted to call Ms. Wingerd at her office phone at 11:38 am and her cell phone at 12:15 pm as I was waiting to check in for my flight from Puerto Rico to Fort Lauderdale. I did not leave a voice mail message on either of Ms. Wingerd's phones when I made these calls because I did not have an urgent message. I called her on April 12, 2017, just to check in with her, as I had not spoken with her in several days. I departed from Puerto Rico at approximately 2:00 pm and landed in Fort Lauderdale at approximately 5:00 pm on April 12, 2017. When I landed in Florida, I received several notices that multiple emails had been released to my Blackberry phone.

58.   On April 28, 2017, Ms. Wingerd and TFIA Sally Space stated during a group meeting that several agents in Group 6504 were calling Ms. Wingerd's and TFIA's office and/or cell phones without leaving messages. Ms. Space also stated that the Caller ID's for the incoming phone numbers were blocked. One of the agents asked how Ms. Wingerd and Ms. Space knew that agents from Group 6504 were calling the telephones, if no messages were left and caller ID was blocked. I suggested that everyone could program their cell phones and their office to unblock their Caller ID when calling Ms. Wingerd and/or Ms. Space. Ms. Wingerd responded that it was a good suggestion and stated that she did not know (prior to me explaining it) how to unblock her Caller ID when using her cell phone and office phone. This suggestion was included in the minutes of the meeting held on April 28, 2017.

59.   When I received my new Blackberry cell phone from COA Ed Herschberger in August 2016, I was not provided written and/or verbal instructions of how to setup the voicemail. I recently learned that several other agents in Group 6504 did not know that a Blackberry phone was not automatically setup to alert them of new or unread voice mails. As a result, when a new message was left on voicemail, my Blackberry did not emanate either visible or audio alerts. On

June 2, 2017, after receiving the proposed suspension, I submitted a request to receive instructions to setup voicemail to alert me of new messages. I received written instructions from COA Elaine Livingston on June 2, 2017. I followed these instructions, and now my phone emanates a notification when I receive a new voicemail.

H.   April 13, 2017 Meeting with Ms. Wingerd

60.   When I returned to the office on April 13, 2017, I began to prepare my travel voucher. Due to the possibility of a government shutdown pending at that time, I wanted to ensure that the voucher was approved and processed for payment as soon as possible. At approximately 9:30 am, Ms. Wingerd came to my cubicle and asked me for a current copy of the SAR for the CE investigation. I then emailed her the three (3) files associated with the SAR to her.

61.   On the afternoon of April 13, 2017, Ms. Wingerd asked me to her office via email. I then reported to her office. During the meeting, Ms. Wingerd asked me three (3) times to explain why I did not respond to her email dated Friday, April 7, 2017, 6:23 pm. I explained to her (as described above in paragraphs 45-46) that when I arrived at my residence on Friday, my wife stated that she wanted to begin celebrating Easter through Sunday, April 9, 2017. I explained to Ms. Wingerd the services at my church (CBG) and that my wife and I were celebrating Easter one weekend early. Also, my wife had potential plans to be traveling on Easter weekend from April 13, through April 17, 2017. My wife stated to me that she was not on call for the hospital, and that she wanted us to devote the weekend to celebrating Easter with friends and at our church, and not work during the weekend. Ms. Wingerd stated to me that it was "unacceptable" that I was celebrating Easter with my wife one week early and that I did not respond to her Friday, April 7, 2017 email, and/or to her telephone calls and emails sent while I was in Puerto Rico. She stated to me that as a Special Agent I am "on call 24/7, which includes nights and

weekends." Ms. Wingerd also stated to me that "I could understand if you were Muslim or you were Jewish, but Easter is just one day."

62.     During this meeting on April 13, 2017, Ms. Wingerd also asked me why the SAR for the CE investigation was not completed by March 31, 2017. I explained to her that I had the flu for a two-week period of time from March 14, 2017, through March 31, 2017, and needed to take annual or sick leave on multiple days during that time. Ms. Wingerd stated to me that she has never heard of and could not believe that someone could come down with the flu for two (2) weeks.

63.     Also during this meeting, Ms. Wingerd asked me why I did not answer her telephone calls and emails while I was in Puerto Rico from April 10, 2017, through April 12, 2017. I stated to her that my travel began on Monday at approximately 2:30 am when I left my house for FLL airport. I stated to her that when I arrived at the hotel in Puerto Rico at approximately 9:00 am that my hotel room was not available. I stated to her that I sat in the hotel lobby for approximately three (3) hours before my hotel room was ready for me to check-in. I stated to her that I did not have cell phone service at that time. I told Ms. Wingerd that shortly after I checked into my hotel room that it was time for me to go to the offices of IRS-CI in Puerto Rico for the pre-op meeting. I stated to her that when I returned to my hotel at approximately 5:00 pm on Monday, April 10, 2017, I immediately went to sleep so I could be prepared for a 5:00 am departure the next morning for the search warrant.

64.     Further, I told Ms. Wingerd during our meeting that I departed the hotel with other agents at approximately 5:30 am, on Tuesday, April 11, 2017, to meet at the staging area in Ponce, Puerto Rico. Ponce is approximately a two-hour drive from San Juan. The search warrant began at approximately 9:00 am. In the afternoon of April 11, 2017, the team leader released several

agents, including myself and Mr. Medina, from the search warrant in Ponce. I do not remember the exact time that we were released. After we were released, we made the two-hour drive back to San Juan. I had poor cell phone reception during this drive. When I got to my hotel room, I believe that I returned to my hotel room at approximately 5:00 pm. I told Ms. Wingerd that I immediately went to sleep after I returned to my hotel room and skipped meeting up with any of the agents for dinner. I explained to Ms. Wingerd that I generally had issues receiving emails and voice mails on my Blackberry while in Puerto Rico. I also told her that I did not receive her phone calls on April 11, 2017.

65.     After our meeting on April 13, 2017, I emailed Mr. Schmit regarding my conversation with Ms. Wingerd. Ms. Wingerd told me during our meeting that I never discussed the due date of the SAR with Mr. Schmit while he was acting SSA. In his reply email to me, Mr. Schmit confirmed to me that he discussed the status of my SAR with Ms. Wingerd. Mr. Schmit stated further that the only thing about the SAR discussed with Ms. Wingerd was that I was sick and that he did not expect much productivity due to my illness.

66.     Subsequent to our meeting on April 13, 2017, Ms. Wingerd placed me on desk duty with specific restrictions. Those restrictions have not been rescinded or amended.

      I.     EEO Complaint

67.     On April 19, 2017, I filed an EEO complaint with an EEO Territory Manager due to the comments made by Ms. Wingerd during our meeting on April 13, 2017, as described in paragraphs 60-64. Specifically, this complaint referred to Ms. Wingerd's words and actions in the April 13, 2017 meeting where she stated that it was "unacceptable" that I was celebrating Easter with my wife one week early, that she could "understand if [I was] Muslim or [I was]

Jewish, but Easter is just one day," and that I am "on call 24/7, which includes nights and weekends." It also referred to her subsequent email with an abridged version of our discussion.

68.     I perceived her actions to be punishment for practicing my religious beliefs in violation of Title 7 of the 1964 Civil Rights Act. When I filed my EEO complaint, the EEO counselor told me there would be a separate hostile work environment investigation due to the verbal comments and written reprimand concerning being on call 24/7.

        J.     Ms. Wingerd's Knowledge of My EEO Complaint

69.     Leave requests for Group 6504 must be submitted in the Group 6504 Leave Calendar in a program called Sharepoint. The process submits a leave request with an email notice to Ms. Wingerd and a courtesy copy to the applicant for leave. Acting SSAs do not have the computer permissions to access to the leave calendar and to approve leave. Hence, any requests for leave from an acting SSA are submitted via email or by telephone and then documented manually in the leave calendar.

70.     On April 19, 2017, at 11:16 am, I submitted a request for administrative leave from 2:00 pm to 3:00 pm on April 19, 2017.

71.     On April 24, 2017, I notified Ms. Wingerd that I had submitted a leave request that was never officially approved in our leave calendar. I also notified Ms. Wingerd that I had submitted an additional request for April 27, 2017, to meet with an EEO specialist with an accompanying EEO investigation case number #IRS-17-0489.

72.     On April 24, 2017, subsequent to our conversation, I received notification that Ms. Wingerd approved the one (1) hour admin leave request for April 19, 2017 and the three (3) hour admin leave request for April 27, 2017.

73.     On April 26, 2017, Ms. Wingerd sent me an email to me that reiterated her approvals of the admin leave to meet with the EEO specialist on April 19, 2017 and April 27, 2017. In this email, Ms. Wingerd asked me to explain the purpose of the admin leave request. I contacted the EEO specialist concerning Ms. Wingerd's question inquiring about the nature of the administrative leave. The EEO specialist told me that Ms. Wingerd only needs to know that it is an EEO consultation.

74.     On April 27, 2017, Ms. Wingerd stated to me that I used an incorrect code in my SETR for April 19, 2017, and April 27, 2017. Ms. Wingerd instructed me to research the correct code and to let her know. I indicated that had asked our subject matter expert, CSA Samantha Bynes, for guidance with the correct SETR codes prior to submitting completing my time and attendance in SETR. Ms. Wingerd instructed me to further research the matter or to have the EEO specialist provide guidance. I then submitted a special request through the ERC system to speak with a SETR specialist. The SETR confirmed that my previous instructions were correct. The SETR specialist stated that there are two codes that could be used to document the EEO time – Holiday/Admin [the original code that I had submitted] or Admin-Miscellaneous [the revised code submitted by Ms. Wingerd].

25

75.    On April 27, 2017, the EEO Specialist stated to me that he would be contacting both Ms. Wingerd and ASAC Dominicis to obtain information regarding their side of the story for my EEO complaint either the first week of May but no later than the second week of May, beginning May 8, 2017. Therefore, I believe Ms. Wingerd knew that I had engaged in the EEO process prior to my receipt of the proposed suspension.

I declare that the foregoing is true and correct to the best of my knowledge and recollection.

_____          _6 / 13 / 17_____
John Bates                                            Date