**EXHIBIT C**

1                UNITED STATES DISTRICT COURT FOR THE
                     SOUTHERN DISTRICT OF FLORIDA
2

3    JOHN BATES,

4                    Plaintiff,

5           vs.                        CASE NO. 21-cv-60978-HUNT

6    JANET YELLEN, AS SECRETARY,
     U.S. DEPARTMENT OF THE TREASURY,
7    INTERNAL REVENUE SERVICE,

8                    Defendant.

9

10

11               VIDEOCONFERENCE DEPOSITION OF

12                     JOHN F. BATES

13               Tuesday, November 14, 2023

14                      10:15 a.m.

15

                     Remote Proceeding
16                 Miami, Florida 33132

17

18

19

20

21

22

23                     Yunier Leyva
                       Digital Reporter
24               Commission No. HH190935

25



JOHN F. BATES                                        November 14, 2023
JOHN BATES vs JANET YELLEN                                        219

```
 1   back because somebody in her chain of command told her
 2   that you can't force agents to answer their phone 24/7.
 3   That's what I believed, but then I got the -- then I
 4   got --
 5       Q.   Mr. Bates -- Mr. Bates, give me just one
 6   second.  I have somebody that's bringing me a pen.
 7       A.   Okay.
 8       Q.   I've ran out of pen.  Give me a second.
 9           THE REPORTER:  Should we go off record?
10           MS. SOTO:  No.
11   BY MS. SOTO:
12       Q.   Go ahead.  We can continue.  Sorry.
13       A.   And then --
14       Q.   My pen ran out of ink.
15       A.   And then to put context into that -- to
16   attribute context to that specific paragraph, on April
17   28, she said, you need to respond to my -- my telephone
18   calls reasonable to your situation.  But then on May
19   12th, I got a -- a notice of a suspension without pay
20   that was unreasonable to my situation because she noted
21   in that item was the e-mail that she sent on April 7,
22   which would've been my Good Friday, and the phone calls
23   that she allegedly tried to call me in Puerto Rico when
24   I was working a -- a 14, 15, 16-hour day in Puerto
25   Rico, 2 days in a row.
```



JOHN F. BATES                                    November 14, 2023
JOHN BATES vs JANET YELLEN                                    221

```
 1   what -- this is the work environment she created, and
 2   that is a phrase to explain the situation that applied
 3   to me and only to me.
 4            I need to take a break for about five minutes.
 5            MS. SOTO:  Yeah.  That works.
 6            THE REPORTER:  All righty.  Going off the
 7   record at 4:15 p.m. Eastern Time.
 8            (A recess was taken.)
 9            THE REPORTER:  All right.  Everyone's
10   returned.  Going back on the record at 4:30 p.m.
11   Eastern Time.
12   BY MS. SOTO:
13      Q.  Okay.  Paragraph 31 H of the complaint -- I'm
14   going to pull it up.  It says, "In July of 2017, the
15   plaintiff's routine within-grade step increase was
16   scheduled to occur.  However, on June 30" --
17            THE REPORTER:  Ms. Soto --
18   BY MS. SOTO:
19      Q.  -- "2007" --
20            THE REPORTER:  -- sorry to interrupt.  I'm --
21   I'm hearing a sound.  I don't know where it's coming
22   from, but it's kind of overloading my audio.  It's like
23   a -- I don't know if it's a crunching sound or a typing
24   sound.
25            All right.  Okay.  There we go.  It stopped.
```



JOHN BATES vs JANET YELLEN

1    And so in order to make -- accommodate him, she wanted

2    to remove the information relating to the hospital

3    where you would go in case of an emergency.  She wanted

4    to remove it altogether from the operational report.

5           And I said, you can't do that.  That's the

6    most basic thing that we need to have in the report.

7    In case somebody gets shot or injured, you need to be

8    able to take him to the trauma center.  You can't just

9    remove it because the ASAC can't read it on his phone.

10          So, you know, I -- I guess my reaction to her

11   wanting to remove the hospital information probably

12   could've been said to her in a better way.  But maybe,

13   you know, my reaction to her lack of experience and

14   knowledge started to get under my skin a little bit

15   that she didn't know how to do some of these things.

16          And in some cases, I was -- you know, I was

17   trying to teach her, trying to give her information.

18   But eventually I -- I -- maybe mostly it was my part, I

19   really didn't want to be the person to try to train her

20   how to do her job, and -- and --

21      Q.  But --

22      A.  -- eventually, I think that they assigned her

23   a mentor as a -- an SSA.

24      Q.  Was that instance when things went downhill

25   for you guys?  In other words, when she became



JOHN BATES vs JANET YELLEN

88

```
 1   derogatory towards you?
 2       A.  No.  She wasn't derogatory towards me.  She
 3   was -- she was trying on different hats.  She didn't
 4   have any experience supervising anyone, so she was
 5   trying different techniques for da -- for various
 6   things, basically.
 7           But when you have someone that has little
 8   experience or no experience, they don't really
 9   understand where the line is in the sand and things
10   that you can't cross.  So early on, we had a TFIA, and
11   she crossed that line with that TFIA.  She demanded to
12   get medical information from our TFIA of why she needed
13   so much sick leave and why she needed to regularly call
14   in and take sick leave in the morning.
15           And that TFIA ended up having to disclose
16   medical information to her that she should not have had
17   to disclose to Karen Wingert, and she found out from
18   another supervisor that Karen Wingert never should've
19   demanded that information.  And -- and that led to a --
20   a huge problem between that employee and her.  So she
21   ended up leaving, and she went to work for another
22   agency, that particular TFIA.
23           So I wa -- I don't want to say that we went
24   downhill from there, but clearly it was mutual that I
25   really didn't want to -- I didn't want to train her.  I
```



1        And so she kept doing it to me, and she kept
2   that parameter on me.  That's the problem we have here.
3   She singled me out out of that group, and sh -- that
4   activity continued because I got a -- a notice on May
5   12th after she said that to the group.
6        I got a notice on May 12th that says, you
7   didn't call me back immediately.  You didn't respond to
8   me timely.  And so now because of it, I'm going to give
9   you a suspension without pay for ten days.
10       Q.  Wait, I -- I just want to make sure.  As in --
11  am I understanding correctly that you were singled out
12  because she was trying to make you the guinea pig in
13  her journey as a -- a new supervisor?  Is that --
14       MR. BERKOWITZ:  Object to the form.  Object to
15  the form.
16       Go on (audio interruption).
17       MS. SOTO:  Did somebody --
18       THE REPORTER:  Okay.  It's just --
19       MS. SOTO:  Did you freeze?
20       MR. BERKOWITZ:  Yeah.  I lost -- I lost you
21  for a second, but I -- I objected to the form of your
22  last question.
23       MS. SOTO:  Okay.  I'll -- I'll rephrase.
24  BY MS. SOTO:
25       Q.  To what -- to what do you attribute Karen



1   me a second.

2         In the -- I don't even know.  Let's close

3   this.  One, two, three, four, five, six, seven,

4   eight -- on the eighth line, the second full sentence,

5   "You need to ensure you respond to my messages in a

6   timely manner even if it is on the weekends or during

7   evening hours." What did you understand that sentence

8   to mean?

9      A.  I understood that sentence to be illegal.

10  That's what I understood it to mean -- it was -- that

11  it was an illegal order.

12        And basically, what she was saying was, I'm

13  putting you on call status, on-duty status, which means

14  I've got to have my phone with me at all times, whether

15  I'm playing ice hockey and having beer and wings

16  afterwards with my friends or I'm at church on Sunday.

17        No matter where I am, what she's saying to me,

18  I've got to have my cell phone with me, and I've got to

19  answer that phone if she calls.  And that's what --

20  understood to me.

21        And when she gave me that notice of 10-day

22  suspension without pay on May 12th, most likely, and

23  it's a guess, at the urging of Kelly Jackson, that

24  meant to me that she was going to enforce that to the

25  nth degree if I didn't reply to her, and -- and so



JOHN F. BATES
JOHN BATES vs JANET YELLEN

November 14, 2023
217

1    alleges that you were "required to respond immediately

2    to Wingert's texts and e-mails.  It created an

3    extremely onerous work environment for Bates alone,"

4    thereby -- "whereby he," you, "were reduced to the

5    extreme extent of being at Wingert's beck and call 24

6    hours per day and 7 days per week." What did you mean,

7    "beck and" -- by -- by "beck and call"?

8        A.  I've already explained that to you.  I

9    wante -- I -- I explained to you in detail what

10   happened and why I felt that --

11       Q.  I --

12       A.  -- way.  And I --

13       Q.  You -- you haven't --

14       A.  -- was -- I was --

15       Q.  You haven't --

16       A.  -- not at her -- I was not at her beck and

17   call like she called me every 5 minutes, and I had to

18   answer my phone every 5 minutes.  The -- the nature of

19   this environment -- this work environment was a

20   combination of her repeatedly saying it in previous

21   occasions, you're on call 24/7.

22           She said it in group meetings.  She said it in

23   the preop for the arrest over in Naples, and she said

24   it to me in person multiple times.  And I don't know

25   the specific dates, so I can't give you specific dates



JOHN BATES vs JANET YELLEN

1   reports here about work life when we did -- they do

2   what's called an annual.  Employees are -- are

3   requested to submit -- or an annual questionnaire

4   relating to work life.  There's an -- these are

5   memorandums of policy regarding case selection.

6        Q.  You said, case selection?

7        A.  Yeah.  The process of how to select a case for

8   investigation.

9        Q.  Okay.

10       A.  Here's another group meeting from 2018.

11       Q.  Is that in the binder with a cover page

12   that -- that says, "Group Meetings"?

13       A.  Yes.

14       Q.  Okay.

15       A.  There's a group meeting from 2017 which is

16   particularly important, January 28th, 2017.

17       Q.  You said January?

18       A.  Yes.  January 28th, 2017.

19       Q.  And when you say it's particularly important,

20   what do you mean?

21       A.  I'm sorry.  It's April 28, 2017.  It's --

22       Q.  Okay.

23       A.  -- particularly important because on the

24   second page of this -- of the notes provided by Karen

25   Wingert, she indicates that, "You are to respond to my



JOHN BATES vs JANET YELLEN

1    phone calls as soon as possible, reasonable to your

2    situation," which absolutely contradicts what she told

3    me multiple times.

4          She said I was on call 24/7, and she said it

5    during preops for search warrants and arrest warrants.

6    She has said it repeatedly throughout all of the time

7    frame that she started her employment there.

8          Until this moment when I filed my EEO

9    complaint, I'm pretty sure someone indicated to her you

10   cannot make special agents be on call or on call or on

11   duty status 24 hours a day, 7 days a week.  It's

12   illegal.

13          In fact, why it's also particularly important

14   because they used to give us what's called a fugitive

15   phone and a SIRF phone for emergencies for these types

16   of investigations.  And if you were to receive a phone

17   call on a Saturday, you were required to be paid

18   overtime because that was a scheduled event for more

19   than one week in advance.

20          They used to schedule out the SIRF phone

21   and/or the fugitive phones, in some cases, months in

22   advance, three to six months in advance.  So if you

23   schedule overtime more than one week in advance and

24   that person actually conducts that activity, they're

25   required to get paid time and a half.  That's called



1  what -- this is the work environment she created, and

2  that is a phrase to explain the situation that applied

3  to me and only to me.

4        I need to take a break for about five minutes.

5        MS. SOTO:  Yeah.  That works.

6        THE REPORTER:  All righty.  Going off the

7  record at 4:15 p.m. Eastern Time.

8        (A recess was taken.)

9        THE REPORTER:  All right.  Everyone's

10  returned.  Going back on the record at 4:30 p.m.

11  Eastern Time.

12  BY MS. SOTO:

13     Q.  Okay.  Paragraph 31 H of the complaint -- I'm

14  going to pull it up.  It says, "In July of 2017, the

15  plaintiff's routine within-grade step increase was

16  scheduled to occur.  However, on June 30" --

17        THE REPORTER:  Ms. Soto --

18  BY MS. SOTO:

19     Q.  -- "2007" --

20        THE REPORTER:  -- sorry to interrupt.  I'm --

21  I'm hearing a sound.  I don't know where it's coming

22  from, but it's kind of overloading my audio.  It's like

23  a -- I don't know if it's a crunching sound or a typing

24  sound.

25        All right.  Okay.  There we go.  It stopped.



1    alleges that you were "required to respond immediately
2    to Wingert's texts and e-mails.  It created an
3    extremely onerous work environment for Bates alone,"
4    thereby -- "whereby he," you, "were reduced to the
5    extreme extent of being at Wingert's beck and call 24
6    hours per day and 7 days per week." What did you mean,
7    "beck and" -- by -- by "beck and call"?
8         A.  I've already explained that to you.  I
9    wante -- I -- I explained to you in detail what
10   happened and why I felt that --
11        Q.  I --
12        A.  -- way.  And I --
13        Q.  You -- you haven't --
14        A.  -- was -- I was --
15        Q.  You haven't --
16        A.  -- not at her -- I was not at her beck and
17   call like she called me every 5 minutes, and I had to
18   answer my phone every 5 minutes.  The -- the nature of
19   this environment -- this work environment was a
20   combination of her repeatedly saying it in previous
21   occasions, you're on call 24/7.
22            She said it in group meetings.  She said it in
23   the preop for the arrest over in Naples, and she said
24   it to me in person multiple times.  And I don't know
25   the specific dates, so I can't give you specific dates



1    that, essentially, in my mind, created a work

2    environment where I was on on-duty status 24/7 because

3    she had said that phrase over and over and over again.

4           We had a search warrant in -- in --

5           Q.  Did she say -- she said what -- what phrase

6    over and over again?

7           A.  That agents are on call 24/7, and she

8    indicated that per the LEAP that we have, and that is a

9    complete distortion and inaccurate statement regarding

10   LEAP.  LEAP doesn't mean you're on call and that you

11   need to answer your phone 24 hours a day, 7 days a

12   week.  It doesn't mean that at all.  And it doesn't

13   mean --

14          Q.  Did she --

15          A.  -- you're on -- on duty.

16          Q.  Did Karen Wingert say that you had to respond

17   to her phone calls regardless of whether you were at

18   church?

19          A.  She put it right there in writing.  And then

20   by May 12th, I had a letter saying that they were going

21   to suspend me for -- for ten days or more, for ten

22   days.  So yeah, that's what it means.  When you put the

23   two together, that's exactly what it means.  And then

24   you get a letter --

25          Q.  Similar --



 1      A.  They're id -- they're basically identical.

 2  There's --

 3      Q.  Okay.

 4      A.  -- there's just a few things that they may not

 5  have you do because you're acting, but it's pretty rare

 6  for them to say, don't do that because you're acting.

 7  That -- that didn't happen very often.  There wasn't

 8  many things you wouldn't do.

 9      Q.  Okay.  Okay.  So prior to your assignment as

10  an acting supervisory special agent, what did you do?

11      A.  I was a special agent.  I began in May of

12  2001.  That's when I was hired by IRS, May 7, 2001.

13          Immediately went to FLETC, there for the

14  six-month training.  When I graduated from there, I --

15  I started working in Plantation, Florida with Group --

16  the group in Plantation.  I want to say the group

17  number was 6502.  Pretty sure that wa -- what's -- what

18  it was.

19          There were four groups in that -- well, there

20  was two groups in Plantation at the time, and I was in

21  Group 2.  Then I transferred to Group 1.  They -- they

22  built up a -- an agent group for Group 1 in Plantation.

23          And during those years, I was working a

24  variety of tax cases, some money laundering cases, and,

25  you know, various Title 18-type -- Title 18 and Title



JOHN F. BATES                                November 14, 2023
JOHN BATES vs JANET YELLEN                              97

1          MR. BERKOWITZ:  Object to the form.

2          THE WITNESS:  Well, this will be an example of

3   a written reprimand.  This e-mail, it's an example.

4   BY MS. SOTO:

5      Q.   Okay.  So what about this e-mail makes it a

6   written reprimand according to you?

7      A.   Well, the written --

8          MR. BERKOWITZ:  Object to the form.

9          THE WITNESS:  -- reprimand says I was

10  celebrating Easter with my wife as opposed to working

11  on a draft of a -- of an SAR which had no tu -- no

12  promise of -- of being completed because it -- it was

13  impo -- it was just impossible to achieve the

14  information that was required for that SAR or even a

15  draft of the SAR.  Be -- be that as it may, aside from

16  the fact that that investigation was completed and had

17  been completed on or before February 18th of 2017.

18  But --

19  BY MS. SOTO:

20     Q.   So --

21     A.   -- my definition of a reprimand is

22  reprimanding me for -- for something and including

23  punishment.  In this case, I'm on desk duty until

24  further notice, meaning she's just going to leave me at

25  my desk to work on an SAR that can't possibly be



JOHN F. BATES                          November 14, 2023
JOHN BATES vs JANET YELLEN

1    SJOHN BATES vs JANET YELLEN

2        A.  Two things.  There's two parts to it.  My

3    knowledge and experience is there are supervisors who

4    they will single one person out of the herd and just

5    belittle them, berate them, reprimand them, do all

6    sorts of things to them as an example to the rest of

7    the herd.

8        Q.  Okay.

9        A.  It was done at US Immigration.  It was -- it

10   was done in my previous experience prior to working

11   for -- for Karen Wingert.  So this is a standard

12   technique done by a lot of supervisors.

13          Now, unfortunately, they have this impression

14   that they could do something to one person and not do

15   it to anyone else and get away with it, and that

16   it's -- it's okay.  So that's -- I have that in my

17   mindset.

18          Is that what she was doing?  I didn't have a

19   conversation with her, and I don't have anything to

20   prove my theory.  All I have is the evidence of the

21   things that she did.

22          She would come to my cubicle, and she would

23   demand to know where Scott Johnson is.  And these

24   things occurred aqua -- after April of 2017.  In front

25   of -- not in front of me, but I -- while I'm sitting in



JOHN F. BATES                                   November 14, 2023
JOHN BATES vs JANET YELLEN

1    my guess is we were on desk duty, and I think this

2    was done on purpose, she came over and had a

3    conversation with Scott Johnson while he was -- well,

4    after he did show up, and told him, well, you've got to

5    be here on time.

6           And instead of doing anything to him, she was

7    more apologetic to him for him being late than what she

8    did to me.  She charged me with AWOL.  What she did to

9    him was completely the opposite.

10          And then after she -- we merged with some of

11   the employees in downtown Miami, she went one step

12   further in that group meeting, and she told everybody

13   in that group meeting, you can glide your day per the

14   IRM.  The word "glide" was actually in the IRM for

15   agents because we're constantly changing our shift or

16   duty to go do search warrants.

17          We're spo -- constantly having to go do

18   staging at 5:00 a.m. somewhere in Port Saint Lucie or

19   downtown Miami or Homestead in order to get there at

20   5:00 a.m.  To be able to do -- to be at staging to make

21   entry at 6:00 a.m., you've got to be up at 3:00, take a

22   shower, get dressed, get your stuff together, make sure

23   you have everything.

24          So what did they do in the IRM?  They said,

25   well, you can glide your day, which means you can flex



JOHN F. BATES                                    November 14, 2023
JOHN BATES vs JANET YELLEN

1   you can -- at that point, you can

2   say you can start your time at say, 3:00 a.m., and then

3   at the end of the enforcement action, you can go home.

4        Not Karen Wingert, huh-uh, not for John Bates.

5   I got to call her and get permission to go home if I'm

6   going to glide my day.

7        Now, fast forward to this group meeting in

8   downtown Miami after we incorporated these other

9   agents.  She went so far as to quote the IRM about

10  gliding your day.  And she said, I don't care if you're

11  even going to be an hour late for work, just come in,

12  do your job, and then change your tour of duty and add

13  an hour to the end of your day.  That's what she said

14  to the group in Miami at the group meeting, and I was

15  there along with Taryn Guariglia, Scott Johnson,

16  Mike --

17       Q.  When --

18       A.  -- Medina, and some of the other agents that

19  were in Plantation.  We went down there for the group

20  meeting.  So yeah.  That's where I come up with my

21  basis that I'm, you know, the one that she's got the --

22  you know, the lion herd is coming after one of the --

23  one of the herd to go after.

24       That's where I get my basis because it applied

25  only to them.  It only applied to the other members of



JOHN F. BATES
JOHN BATES vs JANET YELLEN

November 14, 2023
147

1    single me out and treat me differently to other people.

2          Like I said, I was sitting next to Scott

3    Johnson, and he was -- he was 30 minutes late because

4    of traffic, because of whatever it caused him to get

5    there late from Boca.  I lived in Weston.  I lived 9

6    minutes from the office, so I could get there in a

7    lickety-split.

8          He couldn't plus he was a single parent, so

9    she gave him the benefit of the doubt.  He was a

10   single -- single dad.  It was a very sad situation with

11   his divorce, and apparently, she was at least aware

12   of -- of the situation.  I was --

13        Q.  Okay.

14        A.  -- sitting next to Scott Johnson one day --

15   and this is -- this is something that's important to

16   understand.  I was sitting next to Scott Johnson one

17   morning, and it was -- you know, I used to get there

18   early just so I wouldn't have the problem of being

19   late.  So I would get there, like, an hour early and

20   call it [inaudible 03:30:56] .

21         He was sitting at his cubicle, and I heard

22   this noise, we'll call it, and it was his cell phone,

23   and every time he got a text message, his cell phone

24   would make a noise.  I don't know what the noise was.

25   I don't remember if it was a bell or a chime or what.

1   on-duty status.

2      Q. Sure.

3      A. So this is -- this is a particularly important

4   meeting where she contradicted herself. And then on

5   May 12th, she sent me a -- she provided me with the

6   notice for intent to give me a suspension without pay

7   for the very reason -- the opposite of what she said in

8   this group meeting. So I -- I was singled out based on

9   what she told the group versus what she was telling me,

10   and that's why it's important.

11      Q. Okay. So we have the minutes for April 28,

12   2017. Anything else --

13      A. No. It -- it --

14      Q. -- in front of you? I'm sorry, 2017.

15      A. Yeah. 2017.

16      Q. Okay. Anything else that is in front of you

17   to assist you in your testimony today?

18      A. Of course, there's e-mails back and forth

19   between Karen Wingert and the group regarding these

20   items. I also have printouts of the IRM in this

21   particular binder, various sections of the -- of the

22   IRM relating to overtime and telework request,

23   performance standards, so forth. That's that binder.

24      I have a binder called "Evaluations and

25   Personnel Actions." If you'd like, I can go to my



1  the group.  It didn't apply to me.

2          She still had that -- that unwritten rule plus

3  I wa -- I had that notice that she sent me on September

4  15 of 2017 that said, you do any of this activity

5  again, and you could be terminated between now and a

6  year from now.  That's what that letter says.

7          I don't think anybody read that damn letter,

8  but I did because I was under the impression that I

9  could be terminated.  And that's what she even said to

10  me in her office one time.

11          I don't have proof of it.  I don't -- I can't

12  tell you the time, but it was right around this time

13  frame she actually said the words, well, you said it,

14  you know, it is what it is.  Like, if I'm going to try

15  to terminate you, that's -- that's what I'm trying to

16  do.

17     Q.  Mr. Bates, I -- I just want to close the loop.

18  You said that there were two parts to my question.

19  What was the second part?

20     A.  Well, the first part was the reason why I

21  figured out -- I assumed I was being singled out

22  because I've seen it, and it's my experience.  And the

23  second thing, it's -- it's -- the second prong of why I

24  feel like I'm singled out is because of her actions,

25  her overt acts, the things that she did repeatedly to



1 that, essentially, in my mind, created a work
2 environment where I was on on-duty status 24/7 because
3 she had said that phrase over and over and over again.
4       We had a search warrant in -- in --
5     Q.  Did she say -- she said what -- what phrase
6 over and over again?
7     A.  That agents are on call 24/7, and she
8 indicated that per the LEAP that we have, and that is a
9 complete distortion and inaccurate statement regarding
10 LEAP.  LEAP doesn't mean you're on call and that you
11 need to answer your phone 24 hours a day, 7 days a
12 week.  It doesn't mean that at all.  And it doesn't
13 mean --
14     Q.  Did she --
15     A.  -- you're on -- on duty.
16     Q.  Did Karen Wingert say that you had to respond
17 to her phone calls regardless of whether you were at
18 church?
19     A.  She put it right there in writing.  And then
20 by May 12th, I had a letter saying that they were going
21 to suspend me for -- for ten days or more, for ten
22 days.  So yeah, that's what it means.  When you put the
23 two together, that's exactly what it means.  And then
24 you get a letter --
25     Q.  Similar --



```
 1   for word.  She implied it.

 2           MR. BERKOWITZ:  Amy, we've been going for a

 3   couple of hours.  Can we take a few minutes of a break?

 4           MS. SOTO:  Five minutes good?

 5           MR. BERKOWITZ:  Yeah.

 6           MS. SOTO:  Okay.

 7           MR. BERKOWITZ:  Thank you.

 8           MS. SOTO:  We'll be back here at 2:58.

 9           MR. BERKOWITZ:  Got you.

10           THE REPORTER:  All righty.  Going off record

11   for a break at 2:53 p.m. Eastern Time.

12           (A recess was taken.)

13           THE REPORTER:  All righty.  Everyone's

14   returned.  Going back on the record at 3:01 p.m.

15   Eastern Time.

16   BY MS. SOTO:

17      Q.  Mr. Bates, I'm going to pull up the complaint

18   again -- the second amended complaint.  Specifically,

19   in Paragraph 31 B, it says that "even though the

20   plaintiff possessed the requisite professional

21   qualifications and experience, he was denied the

22   opportunity to serve as an acting supervisor on

23   numerous occasions or even assist coworkers to the

24   detriment of the work group and other employees at"

25   his -- "at this duty post." You see that?
```



1     A.  Yes.

2     Q.  Is that an accurate statement?

3     A.  Yes.  In my --

4     Q.  Okay.

5     A.  -- my --

6     Q.  So --

7     A.  -- perception.

8     Q.  I'm sorry?

9     A.  In my perception, it is accurate.

10     Q.  Okay.  Perfect.  What qualifications are

11 necessary for a special agent to act as a -- as an

12 acting supervisor?

13     A.  Well, in acting as a -- as a -- as an acting

14 supervisor, we discussed, you would want them to be a

15 FLRP candidate.  You would want them to have experience

16 with supervising other employees or other agents and a

17 certain level of experience on the job to understand

18 administrative procedures and -- and how to handle

19 certain things that need to be done.

20     So on -- and I don't have a diary list of

21 examples of -- but it occurred on a regular basis when

22 she would ask someone else to be the acting SSA while

23 she was either on a vacation or on a detail somewhere.

24 Very often -- and I don't -- I want to give you a

25 number or percentage, that person had to come to me and

JOHN BATES vs JANET YELLEN

```
 1   for word.  She implied it.

 2           MR. BERKOWITZ:  Amy, we've been going for a

 3   couple of hours.  Can we take a few minutes of a break?

 4           MS. SOTO:  Five minutes good?

 5           MR. BERKOWITZ:  Yeah.

 6           MS. SOTO:  Okay.

 7           MR. BERKOWITZ:  Thank you.

 8           MS. SOTO:  We'll be back here at 2:58.

 9           MR. BERKOWITZ:  Got you.

10           THE REPORTER:  All righty.  Going off record

11   for a break at 2:53 p.m. Eastern Time.

12           (A recess was taken.)

13           THE REPORTER:  All righty.  Everyone's

14   returned.  Going back on the record at 3:01 p.m.

15   Eastern Time.

16   BY MS. SOTO:

17      Q.  Mr. Bates, I'm going to pull up the complaint

18   again -- the second amended complaint.  Specifically,

19   in Paragraph 31 B, it says that "even though the

20   plaintiff possessed the requisite professional

21   qualifications and experience, he was denied the

22   opportunity to serve as an acting supervisor on

23   numerous occasions or even assist coworkers to the

24   detriment of the work group and other employees at"

25   his -- "at this duty post." You see that?
```



1    A.   Yes.

2    Q.   Is that an accurate statement?

3    A.   Yes.  In my --

4    Q.   Okay.

5    A.   -- my --

6    Q.   So --

7    A.   -- perception.

8    Q.   I'm sorry?

9    A.   In my perception, it is accurate.

10   Q.   Okay.  Perfect.  What qualifications are

11   necessary for a special agent to act as a -- as an

12   acting supervisor?

13   A.   Well, in acting as a -- as a -- as an acting

14   supervisor, we discussed, you would want them to be a

15   FLRP candidate.  You would want them to have experience

16   with supervising other employees or other agents and a

17   certain level of experience on the job to understand

18   administrative procedures and -- and how to handle

19   certain things that need to be done.

20        So on -- and I don't have a diary list of

21   examples of -- but it occurred on a regular basis when

22   she would ask someone else to be the acting SSA while

23   she was either on a vacation or on a detail somewhere.

24   Very often -- and I don't -- I want to give you a

25   number or percentage, that person had to come to me and


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
Esquire Solutions (3376)
800.211.DEPO (3376)
EsquireSolutions.com

1          That within-grade increase was -- was full of

2     false statements, or at -- at least, de minimus.  Like

3     for instance, saying that when you have bulleted items

4     in -- in a report, that you're supposed to have proper

5     punctuation in a bulleted item.

6          Well, that's -- that is absolutely untrue.

7     Bulleted items are supposed to give the reader a break

8     when they're reading lengthy reports, and you're not

9     supposed --

10    BY MS. SOTO:

11         Q.  Okay.

12         A.  -- to have punctuation in there.

13         Q.  Okay.  So you testified earlier that you met

14    with Anthony Dominicus and Karen Wingert August 2016,

15    correct?

16         A.  Yes.

17         Q.  Wh --

18         A.  Yes.

19         Q.  Yes.  Okay.  Sorry.  I didn't hear your

20    answer.  And that July of 2016 was the first time that

21    she had given you instructions to apply pressure on

22    others outside of the organization, correct?

23         A.  I wouldn't say that that was the first time

24    she gave me instructions to put pressure on someone to

25    do their job.  It was the first time she gave me



1   Wingert.

2        MR. BERKOWITZ:  Okay.  Is this the

3   disciplinary proposal?

4        MS. SOTO:  This is the -- what is referred

5   in -- well, let me ask Mr. -- Mr. Bates what his

6   underst -- what this letter is, if he's familiar --

7        THE WITNESS:  It --

8        MS. SOTO:  -- with it.

9        THE WITNESS:  It's a -- it's a -- a letter

10  denying my within-grade increase that was supposed to

11  be effective, I think, in July of 2017.  It's -- it's a

12  letter saying that I'm not meeting the basic elements

13  of the performance of -- of my position, and it was

14  establishing a 60-day PIP, basically.

15  BY MS. SOTO:

16     Q.  Was a -- was it actually a -- a PIP?

17     A.  As I understand it -- and this is after --

18  things like this started to occur to the point that

19  they, meaning the Merit Systems Protection Board,

20  issued clarification of how you can establish a PIP for

21  an agent.  And the method and the manner in which she

22  did this, if the statements were true, probably

23  would've qualified it as a PIP.

24        However, as I've stated and I can prove, she

25  had committed -- she submitted false statements in this



JOHN BATES
BATES vs YELLEN

1    did it contain false and fraudulent facts as alleged

2    in paragraph 31H of the second amended complaint?

3        A.   That paragraph is -- is accurate as far as I

4    can tell.

5        Q.   Okay.  So let's go on to the final

6    specification, which is specification 4.

7        A.   I do need to say something about

8    specification number 3.

9        Q.   Go ahead.

10       A.   The reason why an interview was not prepared

11   for that other -- an MOI was not prepared for that

12   interview, is because I was instructed by the ASAC,

13   Anthony Dominicis, not to use Karen Wingard as an --

14   as a witness anymore, because she was a liability.

15       And the problems that she indicated that really

16   didn't exist on the other MOI that I did complete,

17   when her -- with her confusing the two interviews, it

18   created a liability.  Because she was -- it was going

19   to call into question her ability to recall

20   information, and ascertain the information and then

21   you know, assist with the preparation of an -- of an

22   MOI.

23       So he instructed me not to use Karen Wingard

24   anymore, for any -- any more investigations.  So what

25   I did, after talking to ASAC, Anthony Dominicis -- and



1   that conversation was documented and -- and confirmed

2   by other -- three other people who were standing

3   very -- nearby when I had that -- it was Mark

4   Nuremberg (ph), Lewis Babino (ph), and Drew Schmidt

5   (ph).

6         They were standing right next -- right next to

7   me -- right next -- right near the office for Anthony

8   Dominicis.  And they laughed because -- when I told

9   them -- they -- they said, "Well, what did the ASAC

10  say?"  And he said, "Don't use Karen for any more

11  witness -- for any more interviews."

12        And they laughed like -- they looked at me like,

13  "Well, you should have known that right now."  And I

14  did not, because I don't remember ever having her

15  assist me with any interviews prior to that time.

16        So there was no interview MOI prepared for that

17  other -- other interview.  What I ended -- I ended up

18  doing was, I ended up getting another agent and we

19  went to go track down that witness to re-interview

20  that witness.  So that we could refresh the

21  information and prepare a new memo without Karen

22  Wingard being a witness.

23        Q.  When ASAC Dominicis, told you not to use

24  Karen Wingard anymore, did he specifically instruct

25  you not to prepare a memorandum of interview for that

