# EXHIBIT C

## Volume II

```
 1         UNITED STATES DISTRICT COURT FOR THE
              SOUTHERN DISTRICT OF FLORIDA
 2

 3    JOHN BATES,

 4           Plaintiff,

 5    v.                        Case No.: 21-cv-60978-HUNT

 6    JANET YELLEN, AS SECRETARY,
      U.S. DEPARTMENT OF THE
 7    TREASURY, INTERNAL REVENUE
      SERVICE,
 8
             Defendant.
 9

10

11

12                      DEPOSITION OF

13                       JOHN BATES

14

15                   NOVEMBER 16, 2023

16                        9:17 A.M.

17                    Remote Proceeding

18

19

20

21                      YUNIER LEYVA

22                    Digital Reporter

23                 Commission No:  HH190935

24

25
```



```
 1            MS. SOTO:  For the record.  This is a letter
 2   dated September 15, 2017, from Karen Wingard -- signed
 3   by Karen Wingard to you, Mr. Bates.
 4            THE WITNESS:  Correct.
 5            MS. SOTO:  This was prepared in response to
 6   request for production 19.
 7   BY MS. SOTO:
 8       Q.  Is this a letter that you referenced in your
 9   complaint?
10       A.  Yes.
11       Q.  And from this letter, where does it say that
12   Karen Wingard can form false accusations and terminate
13   you?
14       A.  It says, "Accordingly, no further action will
15   be taken at this time to remove you or to reduce you
16   in grade -- pay grade -- pay ban, for your
17   unacceptable performance, and your with-in-grade
18   increase will be released."
19            That statement in there is telling me that I was
20   in a process to be removed as an agent.  That's what
21   it indicates to me.  It applies that to me in those
22   words.
23            And so if your -- and then it says, "If your
24   performance again becomes unacceptable before June
25   30th of 2018, I may recommend your removal reduction
```



JOHN BATES November 16, 2023
BATES vs YELLEN

1  in pay grade with affording -- without affording you
2  an additional opportunity to improve your
3  performance."
4       I don't know if that follow -- follows a lengthy
5  lieu of procedures of what you're going -- what you
6  should be doing or not doing, for an employee
7  regarding performance issues.
8       But the fact that she put false statements -- and
9  I didn't say that the with-in-grade increase contained
10 word-for-word, every single word, something that was
11 false or fraudulent.  What I stated was, that
12 with-in-grade increase contained at least one or
13 more -- it contained "plural," false statements or
14 fraudulent statements.
15      And then, that with-in-grade increase was
16 actually implemented.  And it was -- and I had already
17 submitted a with-in-grade increase reply that was
18 reviewed by the ASAC.  And they still --
19      Q.  And what was the outcome of that --
20      A.  -- went forward.  What's that?
21      Q.  I'm sorry.  Finish what you were saying.
22      A.  And -- and so since they implemented --
23 implemented a 60-day hold on my with-in-grade increase
24 based on false and deceptive information, I was in
25 fear for my job based on future false information and



```
 1   fraudulent information being leveled against me, over
 2   the -- between then and June 30th, 2018.  And this
 3   letter is the reason why I felt that way.
 4          And I -- and I had -- in multiple parts of my
 5   complaint process, it specified, one of my
 6   specifications, which could have been done and should
 7   have been done immediately, was to be transferred to
 8   another work group.
 9          Any one of the other work groups in -- in
10   Plantation I could have gone to and worked to --
11   worked with.  And been out of range of her continual
12   harassment and retaliation.
13          Q.  Mr. Bates, you referenced that you responded
14   to the with-in-grade increase delay.  What was the
15   outcome of that?
16          A.  I just told you it was implemented.  I -- I
17   met with ASAC, which was a very weird meeting.  So --
18          Q.  What do you mean by that?
19          A.  It was alone in her office.  I had -- didn't
20   think it was normal.  But I talked to her about my
21   reply -- my -- my reply -- my rebuttal to the with-in-
22   grade increase, and I documented everything that we've
23   talked about.  I documented all the items, at least
24   most of them.
25          The things that we've talked today, we got more
```



JOHN BATES
BATES vs YELLEN
November 16, 2023

1  into the weeds than I did even with her.  I just
2  figured, if I at least documented some of the problems
3  that -- that made that with-in-grade increased denial
4  defective, that it wouldn't be implemented.
5       Because I understood that if you put someone on a
6  pip, your information for that pip, has to be rock
7  solid.  It has to be documented, it has to be well
8  prepared and so forth.
9       And in this case -- it was horribly prepared and
10 it was inaccurate at the -- at the minimum and
11 fraudulent in other areas where -- as I -- we've
12 discussed.
13      Q.  Were you placed on a performance improvement
14 plan?
15      A.  That was my perception.  I don't know if --
16 if that was the actual result of this, I don't know.
17 But in essence, that is what happened because for the
18 next 60 days, I was being monitored every single day
19 for what I did or didn't do.
20      I had like a list of things that I had to do.
21 And I obviously did all those items, which I had been
22 doing all along.  And she had no choice but to give me
23 my with-in-grade increase.
24      Q.  And you said earlier that you requested a
25 transfer.  To whom did you request that transfer?



```
 1   working the investigation.  This person was egregious.
 2   This person should have been indicted with multiple
 3   unrelated crimes throughout years of committing
 4   criminal activity.  And we felt that it was in the
 5   best interest of the public to pursue criminal
 6   violations against this person, because this person
 7   was a bad person.  And so --
 8        Q.  And when did you -- oh, sorry.
 9        A.  And so it -- it was after emailing Alicia
10   Shick and Alicia Shick and I at least had at least one
11   telephone conversation after February 18th, 2017 to
12   discuss the -- the referral.  I know I had another
13   discussion with Rick -- Rick Murad.  It just -- it was
14   clear nobody really wanted to work it.
15        It wasn't that I had a deficient work product.  I
16   clearly documented all the evidence you needed to
17   indict this person for SIRF.  But we -- Karen Wingard
18   and I and her supervisor, we -- we had a discussion
19   about it.  And I don't know if I had a discussion, we
20   either had a discussion, all three of us together.
21        But all of that -- all of these directive -- all
22   of these things that you do when you take an
23   investigation, and you change direction or you --
24   you're -- you're going to do something that's going to
25   change the previous parameters of what you were doing
```